## R. & G. ORTHOPEDIC APPLIANCES AND PROSTHETICS, INC., Appellant,

v.

## Michael CURTIN, Personal Representative of the Estate of Blondell Brown, Deceased, Appellee.

### Nos. 89–134, 89–780.

District of Columbia Court of Appeals.

Argued Jan. 9, 1991.
Decided Aug. 27, 1991.

Angus R. Everton, with whom Roy L. Mason, Baltimore, Md., was on the brief, for appellant.

Sanford A. Friedman, with whom Leo A. Roth, Jr., Washington, D.C., was on the brief, for appellee.

Before TERRY and SCHWELB, Associate Judges, and KERN, Senior Judge.

SCHWELB, Associate Judge:

In October 1985, the right leg of plaintiff's decedent, Blondell Brown, who was suffering from diabetes, was amputated below the knee. Subsequently, Ms. Brown sought redress for her injury by filing an action for negligence [1] against appellant R. & G. Orthopedic Appliances and Prosthetics, Inc. (R. & G.), a supplier of orthopedic shoes, and Howard University (Howard), which operates Howard University Hospital. The essence of Ms. Brown's claim against R. & G. was that, in fitting her with a pair of orthopedic shoes prescribed by a Howard podiatrist, this defendant had failed to follow the directions of the podiatrist with respect to the material to be used. Ms. Brown contended that R. & G.'s negligence had caused blistering on her right foot and that gangrene had developed, so that amputation was the only recourse. Ms. Brown further claimed [2] that Howard committed malpractice by negligently failing to detect the seriousness of the condition allegedly caused by R. & G.'s negligence and by not directing that she be hospitalized after she reported the blistering. R. & G. and Howard filed cross-claims against one another.

---

1. Ms. Brown's complaint also alleged strict liability and breach of warranty. The trial court granted R. & G.'s motion for a directed verdict with respect to these claims, and no question regarding them is presented on this appeal.

2. Ms. Brown's original complaint named R. & G. as the sole defendant. She joined Howard in an amended complaint.

The case proceeded to a jury trial on November 29, 1988. On December 13, 1988, at the conclusion of the plaintiff's case, Ms. Brown reached a settlement with Howard. Under the terms of that settlement, Howard was to pay Ms. Brown $200,000 in return for the dismissal of the action against Howard. Howard also dismissed its cross-claim against R. & G. and participated in the trial no further. At the conclusion of the trial, the jury returned a verdict of $750,000 against R. & G.

On February 8, 1989, the trial judge, sitting without a jury, held a hearing on R. & G.'s cross-claim against Howard for indemnity or, in the alternative, equitable apportionment or contribution. In conformity with the terms of the settlement agreement between Ms. Brown and Howard, which provided that Ms. Brown should be responsible for the defense and resolution of any remaining claims which R. & G. might have against Howard, Howard was represented in this phase of the case by Ms. Brown's counsel. On May 27, 1989, the trial judge issued a written order in which he denied R. & G.'s claim for indemnity but granted R. & G. contribution in the amount of $375,000, or one half of the jury's award.

On appeal, R. & G. contends that it is entitled to a new trial on the basis of two unfavorable evidentiary rulings. First, R. & G. maintains that the judge improperly declined to permit it to call Dr. Mark Berman as an impeachment witness, and thus prevented it from completing the impeachment of Dr. Patricia Schultz, a Howard University podiatrist who testified on behalf of Ms. Brown. Second, R. & G. argues that the judge abused his discretion when he denied its motion to amend its witness list to add a different Howard University expert, Dr. E. Dalton McGlamry, who had given certain testimony favorable

to it in a videotaped *"de bene esse"* deposition which was taken for use at trial. R. & G. also contends that the trial judge erred in refusing to sustain its claim for indemnity.

We agree with R. & G. that the judge should have permitted Dr. Berman to testify and that, under all of the circumstances, the error in excluding his testimony was not harmless. A new trial is therefore required. In the event that R. & G. is held to be liable at a new trial and R. & G.'s claim for indemnity is reached, the trial judge is directed to clarify certain of his findings and then, if necessary, modify his decision in conformity with this opinion.

I

THE FACTS

As a result of her diabetic condition, which was compounded by cigarette smoking, Ms. Brown suffered from circulatory problems which caused recurring ulcers on her feet. In 1980 or 1981, Ms. Brown came under the care of Dr. Schultz at the Howard University Podiatric Clinic. In 1983, Ms. Brown was hospitalized for gangrenous changes on four of her toes, one of which had to be amputated. She developed osteomyelitis [3] in the three remaining affected toes, a condition which put her entire leg at risk. For the time being, however, Ms. Brown was successfully treated with antibiotics.[4]

In February 1984, Dr. Schultz recommended to Ms. Brown that she obtain custom-molded shoes.[5] Ms. Brown received an appropriate referral form and voucher, and was directed to Charlotte Gottlieb, a supplier of such shoes. Ms. Brown declined to obtain these shoes at this time, however, because she considered them "ugly." On June 14, 1984, she suffered a fracture of one of the bones in her feet. On July 19,

---

3. Osteomyelitis is an inflammation of the bone.

4. Amputation of a portion of the leg was first recommended to Ms. Brown in 1983 as a result of some signs of gangrene. She refused to permit this procedure, however, "because I knew the leg would heal." On this occasion, it did.

5. Custom-molded shoes are prescribed for diabetics for the purpose of minimizing the formation of blisters. They are ordered by prescription, and a shoe distributor, such as R. & G., takes a cast of the patient's foot and prepares an outline drawing. The cast and drawing are then forwarded to a manufacturer, who prepares the shoes accordingly.

1984, Ms. Brown's feet were found to have new ulcerations and infections which were apparently caused by pressure points from the shoes which she was wearing. It was suggested once again that Ms. Brown obtain molded shoes, but at this time she did not do so.

In April 1985, Ms. Brown used a hot water bottle against medical advice in order to warm her feet. After examining Ms. Brown, Dr. Schultz repeated her recommendation that she obtain molded shoes. Dr. Schultz gave Ms. Brown a voucher which would enable her to secure them. Dr. Schultz testified that she suggested two alternative suppliers of such shoes, one being Charlotte Gottlieb and the other being R. & G. Dr. Schultz had used Charlotte Gottlieb's services for four years, but had not previously ordered orthopedic shoes from R. & G. She prepared prescriptions for Ms. Brown to present to each of these suppliers.

There was considerable and conflicting expert testimony regarding the proper composition of the molded inserts for the shoes prescribed for Ms. Brown. Dr. Schultz and the experts called by Ms. Brown [6] testified that the only appropriate insole material for a diabetic person was "plastizote," a very soft, spongy material. On the other hand, Dr. John Senatore, an expert in podiatry called by R. & G., testified that use of plastizote was not required by the applicable standard of care, and that a more rigid material was appropriate for the insole, provided that it was properly molded. Dr. McGlamry, an expert witness for Howard, also stated in his deposition that the use of plastizote was not required. According to Dr. McGlamry, plastizote is softer and more yielding than other materials and initially molds better to the contours of the foot, but it also has a tendency to "bottom out" after a few months and provides "less protection than if you had something more substantial." [7]

Dr. Schultz testified that it was always her intention that Ms. Brown's insole would be constructed of plastizote. Although, she did not so specify on the Charlotte Gottlieb prescription, she asserted that "most'likely" she wrote plastizote on the prescription directed to R. & G. She also stated that she telephoned R. & G. and orally specified that the insoles should be made of plastizote. She was unable to recall, however, to which of two R. & G. representatives she conveyed this direction.

After some delay, the custom-molded shoes were furnished to Ms. Brown on July 3, 1985. Ms. Brown testified that she complained to Jeannette Flynt, the orthotist [8] assisting her at R. & G., that the shoes were uncomfortable. Ms. Flynt testified, to the contrary, that Ms. Brown made no such complaint. It is undisputed that Ms. Flynt advised Ms. Brown to wear the shoes for progressively longer periods each day. Ms. Brown testified that she wore the shoes for approximately an hour and one half on the first day she had them, and for approximately forty-five minutes on the following day. She then noticed blisters on her right foot and stopped wearing the shoes.

On July 9, 1985, on a regularly scheduled visit to the Howard University Podiatry Clinic, Ms. Brown told Dr. Schultz about the blistering which had apparently been caused by the molded shoes. Dr. Schultz renewed an antibiotic medication which Ms. Brown had been taking, surgically removed some dead tissue, drained Ms. Brown's abscesses and, according to the entry on the

---

**6.** These experts included Dr. Peter Cavanaugh, the director of a diabetic foot clinic at Pennsylvania State University, and Dr. Clark Miller, a podiatrist who specialized in testifying in podiatric malpractice cases.

**7.** For reasons discussed at pages 541–542, *infra*, the jury never heard Dr. McGlamry's opinion regarding the propriety of using materials other than plastizote.

**8.** For the rare reader who may not have such terms at his (or her) fingertips, an "orthotist" is a person skilled in "orthotics." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 937 (26th ed.1981). "Orthotics" is the field of knowledge relating to "orthoses" and their use. *Id.* "Orthoses" is the plural of "orthosis." *Id.* Orthosis, Greek for "making straight," is an "orthopedic appliance or apparatus used to support, align, prevent or correct deformities, or to improve the function of movable parts of the body." *Id.*

clinical records, "referred [the patient] back to the shoe lab."

Ms. Brown next returned to the clinic on July 16, at which time Dr. Schultz found some healing, but also noted "persistent ulcerations" in several of Ms. Brown's toes. Dr. Schultz testified that she first saw the molded shoes on the occasion of Ms. Brown's July 16 visit to the clinic, and realized then that the "orthosis" portion of the shoes was made of a hard rubber substance, rather than of plastizote. She stated that she had "a very sharp visceral reaction," that she was "stunned," and that she "could feel [her] body clinch up." She attributed these reactions to her realization that the shoes were made of a substance which she had not anticipated and which, in her view, was harmful to Ms. Brown.

Dr. Schultz did not direct, during July, that Ms. Brown be admitted to the hospital as an inpatient.[9] She testified that on July 16, 1985, she directed Ms. Brown to return to R. & G. to have her shoes adjusted or replaced. Ms. Brown made no further visit to R. & G., however, and no adjustment was made to the shoes. Meanwhile, on July 17, 1985, Dr. Schultz left for her vacation.

On August 6, 1985 Ms. Brown was admitted to Howard University Hospital for antibiotic therapy and bed rest. She was discharged on August 19th after she refused to continue the prescribed treatment. Outpatient treatment, consisting of cleaning and dressing Ms. Brown's foot, was continued during the remainder of August and early September, when she was readmitted to the hospital for exploratory surgery. After that surgery was performed, Ms. Brown again left the hospital against medical advice. By the time that she returned on October 16th, her right foot had become gangrenous. Her right leg was amputated below the knee on October 17th.

At trial, R. & G. vigorously contested not only Ms. Brown's allegation that it was negligent, but also her contention that its conduct was a proximate cause of the loss

of Ms. Brown's foot and lower leg. On the issue of negligence, R. & G. challenged Dr. Schultz's claim that she had directed that plastizote be used for Ms. Brown's orthopedic shoes. R. & G. relied on the testimony of Dr. Senatore (and also attempted to use the deposition of Dr. McGlamry) to counter the views of Dr. Schultz, Dr. Cavanaugh, and Dr. Miller that its failure to use plastizote was inappropriate in treating a diabetic patient. On the question of causation, R. & G. offered the testimony of Dr. Barbara Douglas, a physician specializing in internal medicine, who testified inter alia that there were a number of factors which may have contributed to Ms. Brown's loss of her leg, including the patient's smoking and her use of a hot water bottle. According to Dr. Douglas, the need for amputation could not be attributed with a reasonable degree of medical certainty to R. & G.'s conduct, or even to the ulceration of her toes, and Ms. Brown's leg would ultimately have been amputated even if she had not worn the shoes provided to her by R. & G. R. & G. also relied on parts of the testimony of two of Ms. Brown's experts, Dr. Miller and Dr. David Morowitz, each of whom indicated that the applicable standard of care required Ms. Brown's hospitalization in light of her condition on July 9 and 16, 1985, and that if Howard had exercised due care, amputation could have been avoided.

R. & G.'s motion for a directed verdict, which was largely based on an allegedly deficient showing of proximate cause, was denied by the trial judge. The trial ended with the jury's award of $750,000 to the plaintiff.

II

THE EXCLUSION OF IMPEACHMENT TESTIMONY

A. The ruling and its context.

Section VII(3) of the trial judge's "Standing Memorandum and Order" in Civil I cases provided as follows:

9. Ms. Brown subsequently presented expert testimony at the trial to the effect that Howard's failure to hospitalize her on July 9 or July 16,

1985 was a deviation from accepted standards of care and resulted in the amputation of her leg.

Exhibits to be introduced, and witnesses who are to testify, at trial shall be limited to those identified in the pre-trial statements of the parties, except as to exhibits that might be introduced, *or witnesses who might testify, for purposes of impeachment.*

(Emphasis added). The first evidentiary issue presented to us by R. & G. relates to the proper construction of this limitation on the eligibility of witnesses, and especially of the italicized phrase.

Dr. Patricia Schultz, although employed by Howard, was called as Ms. Brown's first witness. Her testimony, as we have noted, *see* pages 533 to 535, *supra,* provided Ms. Brown with her heaviest artillery against R. & G. She testified that she had directed R. & G. to use plastizote in Ms. Brown's orthopedic shoes, and she claimed to have been horrified when R. & G. failed to do so. Dr. Schultz's testimony, if credited, could be devastating to R. & G., and counsel for that defendant devoted a considerable amount of effort to impeaching Dr. Schultz.

When the time came for R. & G.'s counsel to present its defense, she requested leave of court to examine Dr. Schultz as an adverse witness. There was no objection from the attorneys for either of the other parties, and the judge granted R. & G.'s request. Under these circumstances, R. & G. had the right to call Dr. Schultz in its own case, but nevertheless to attempt to impeach her with a prior inconsistent statement. Super.Ct.Civ.R. 43(b); *Cooper v. Saunders–Hunt,* 365 A.2d 626, 629 (D.C.1976); III A.J. WIGMORE, EVIDENCE, § 916, at 709 (Chadbourn Ed.1970 & 1991 Supp.).

R. & G.'s counsel embarked on this strategy by confronting Dr. Schultz with her failure to write "plastizote" on the prescription blank issued to the other proposed supplier, Charlotte Gottlieb. After thus attempting to cast doubt on Dr. Schultz's assertions that she had insisted on plastizote, R. & G.'s attorney continued her examination as follows:

Q: Doctor do you know a [prosthetist] by the name of Mark Berman?

A: Yes, I do.

Q: Do you recall having a conversation about this case with Mark Berman?

\* \* \* \* \* \*

THE WITNESS: Yes.

Q: Do you recall telling him that— about the prescription that you wrote to R. & G. for Mrs. Brown's custom molded shoes?

A: No.

Q: You don't recall that?

A: I don't remember the details.

Q: Do you recall telling him you did not specify plastizote on that prescription?

A. No, I don't.

Counsel for Howard now objected on the ground that Dr. Berman had not been identified as a witness in R. & G.'s pretrial statement. When R. & G.'s attorney attempted to explain, the judge was plainly not enthralled:

MS. CUMMINS (Counsel for R. & G.): Your Honor, if Mark Berman is called and he's under subpoena—he will be ... an impeachment witness, and it's my understanding that impeachment witnesses are not required to be named.

THE COURT: No, you don't play those games with me. You have known from the outset you were going to call him as a witness.

MS. CUMMINS: I didn't.

THE COURT: Well how did you know to examine him about it when nobody else has? It came up on your own examination.

MS. CUMMINS: That's right, and this trial has made some news in the field of orthotics and—

THE COURT: Well, you have a continuing duty to disclose. You can't put on a witness just because you're permitted to call that witness as an adverse witness and elicit something for the first time you knew about and having disclosed to other counsel and then call it impeachment.

The only witnesses you're not obligated to disclose in this case are people who are genuinely impeachment witnesses; people who are called in rebuttal to

things other people raise you didn't know were coming out and then you go out and find those witnesses. You can't play these kinds of games Ms. Cummins.

The judge sustained Howard's objection, and instructed the jury that Dr. Berman would not testify and that no evidence would be presented regarding any alleged conversation between him and Dr. Schultz.

*B. Impeachment procedure and impeachment witnesses.*

Of the various kinds of attacks on the credibility of a witness, impeachment by a prior inconsistent statement is probably the most effective and the most frequently employed. E. CLEARY, MCCORMICK ON EVIDENCE § 33, at 72 (3d ed. 1984). This is classic impeachment. An "impeachment witness," by definition, includes one who will testify that the adversary's witness has made a prior inconsistent statement, and is therefore less worthy of belief than if she had testified consistently.

Impeachment takes place in two stages. Quoting from *Queen Caroline's Case,* 2 Brod. & Bing. 284, 313, 129 Eng.Rep. 976, —— (1820), Professor McCormick has written that

> [i]f it be intended to bring the credit of a witness into question by proof of anything he may have said or declared touching the cause, the witness is first asked, upon cross examination, whether or not he has said or declared that which is intended to be proved.

MCCORMICK, *supra,* § 37, at 78–79. The purposes of this traditional requirement, according to Professor McCormick, are to avoid unfair surprise to the adversary, to save time (in that an admission by the witness that he or she made an inconsistent statement may make extrinsic proof unnecessary), and to give the witness an opportunity to explain the discrepancy. *Id.* at 79. Professor McCormick continues as follows:

To satisfy the requirement in jurisdictions in which it is enforced, the cross-examiner will ask the witness whether the witness made the alleged statement, giving its substance, and naming the time, the place and the person to whom made. The purpose of this particularity is, of course, to refresh the memory of the witness as to the supposed statement by reminding the witness of the accompanying circumstances. If the witness denies the making of the statement, or fails to admit it, but says "I don't know" or "I don't remember" then the requirement of "laying the foundation" is satisfied and the cross-examiner, at the next stage of giving evidence, may prove the making of the alleged statement.

*Id.*

■ The procedure envisaged by Professor McCormick was precisely that which counsel for R. & G. attempted to follow in this case. In the District of Columbia, a prior inconsistent statement may not be used as substantive evidence of the truth of the matter asserted; it is admissible only to assist the jury in evaluating the credibility of the witness. *Gordon v. United States,* 466 A.2d 1226, 1231 (D.C.1983). Under these circumstances, Dr. Berman was the quintessential impeachment witness; he was to testify to an allegedly prior inconsistent statement by Dr. Schultz which would be used to impeach her. Under the trial judge's written procedures, R. & G. was not obligated to include Dr. Berman's name on the witness list at the pretrial conference. He was an impeachment witness, not a substantive one.[10]

■ In sustaining Howard's objection, the trial judge evidently took the position that Dr. Berman was not a proper impeachment witness because R. & G.'s counsel was previously aware that Dr. Schultz would give testimony which Dr. Berman would be able to impeach. Apparently, the

---

**10.** If R. & G. had requested the judge to receive Dr. Berman's testimony to establish an admission by a *de facto* party opponent—to prove, in other words, that Howard, through Dr. Schultz, failed to direct R. & G. to use plastizote—then he would have been a substantive witness as well as an impeachment witness. Disclosure at pretrial of R. & G.'s intention to call him could then properly have been required. But this does not, in our view, warrant the exclusion of his proposed testimony insofar as it would have impeached Dr. Schultz by disclosing what R. & G. alleged to be a prior inconsistent statement on her part.

trial judge thought that a party is not entitled to present impeachment testimony unless that party has been surprised at trial. We know of no authority for that proposition, and none has been cited to us. We agree with R. & G. that if surprise were a precondition for the exercise of the right to present impeachment testimony, then few if any litigants would have an opportunity to learn of prior inconsistent statements, or to secure the attendance of witnesses to testify about them.[11]

■ Ms. Brown contends that R. & G.'s counsel "attempted to create the need to have [Dr.] Berman testify as an impeachment witness." She points out that Dr. Schultz's testimony that she did not recollect what she told Dr. Berman was brought out by R. & G., not by her. She claims that "the [d]efendant was thus trying to create the need to impeach someone by their [sic] own questioning."

This contention falls wide of the mark. Dr. Schultz having testified during the presentation of the plaintiff's case that the use of plastizote was essential and that she was devastated when R. & G. used a different material, R. & G. had the right to try to discredit that direct testimony by showing that, on a prior occasion, Dr. Schultz had made a statement to the contrary. The testimony R. & G. was attempting to impeach was not Dr. Schultz's lack of recollection (adduced by R. & G.) but her affirmative testimony, damaging to R. & G., which had been adduced by Ms. Brown as part of her own case.

Ms. Brown relies on *Morgan v. Commercial Union Assurance Co.*, 606 F.2d 554 (5th Cir.1979) and *Grant v. Brandt*, 796 F.2d 351 (10th Cir.1986), but neither case is in point. *Morgan* stands for the proposition that "a defense witness whose purpose is to contradict an expected and anticipated portion of the plaintiff's case in chief can

never be considered a rebuttal witness, or anything analogous to one," and must therefore be identified on the proponent's witness list. *Morgan, supra,* 606 F.2d at 556. *Grant* holds that a trial judge may exclude the "rebuttal" testimony of an unlisted witness when the testimony sought to be rebutted was elicited by the party seeking to contradict it. 796 F.2d at 356. In neither case was the witness in question an "impeachment" witness, and neither court addressed the question presented here.

### C.   Harmless error analysis.

■ We proceed to the inquiry whether what we have found to be the trial judge's erroneous ruling regarding the proposed impeachment testimony warrants reversal. R. & G. was entitled "to a fair trial, but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984). "Dialectical perfection, metaphysical nicety, [or] abstract inerrancy, are not expected or required of ... trial courts." *Guaranty Dev. Co. v. Liberstein,* 83 A.2d 669, 671 (D.C.1951) (quoting *Dallas Ry. & Terminal Co. v. Sullivan,* 108 F.2d 581, 584 (5th Cir.1940)). Our aim in assessing whether trial court error requires reversal must be to do "substantial justice," and "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Super.Ct.Civ.R. 61.

Rule 61 is identical to its federal counterpart. Although Rule 61, FED.R.CIV.P. applies by its terms only to trial courts, "it is well settled that appellate courts should act in accordance with [its] salutary policy." *McDonough Power Equip., Inc., supra,* 464 U.S. at 554, 104 S.Ct. at 849. We

---

11. The trial judge's antipathy to surprise testimony is quite understandable. In his oral ruling, he appeared to equate "impeachment witness" with "rebuttal witness," and it may be that the intent of the "impeachment witness" exception in his "Standing Memorandum and Order" was to avoid surprises.

The judge could, of course, have limited the exception from the pretrial disclosure requirements to those impeachment witnesses of whom the proponent was previously unaware. That, however, was not what the "Standing Memorandum and Order" provided, and counsel for R. & G. could not fairly be required to read into that document something that was not there.

construe our Superior Court's Rule 61 in the same manner.

Although the courts of this jurisdiction have frequently addressed the concept of harmless error in the context of criminal appeals, they have rarely done so in civil litigation. In *Chichester Chem. Co. v. United States*, 60 App.D.C. 134, 49 F.2d 516 (1931), the court articulated an exacting test for finding trial court error harmless, stating that

> it is only when *it is certain* that the error assigned could not have prejudiced the complaining party that the rule—that it is no ground for reversal—is applicable.

*Id.* at 137, 49 F.2d at 519 (emphasis added). This court followed *Chichester Chemical*, as it was required to do, in *Fowel v. Insurance Bldg., Inc.*, 32 A.2d 100 (D.C.1943), quoting in its entirety the passage requiring a measure of certitude which, while always desirable, is not often attainable.

These decisions are consistent with the older cases in the Supreme Court. That Court held in *Smiths v. Shoemaker*, 84 U.S. (17 Wall.) 630, 639, 21 L.Ed. 717 (1873), that for trial court error to be found harmless, "it must appear so clear as to be *beyond doubt* that the error did not and could not have prejudiced the right of the party" (emphasis added). *Accord, Crawford v. United States*, 212 U.S. 183, 203, 29 S.Ct. 260, 267, 53 L.Ed. 465 (1909); *Deery v. Cray*, 72 U.S. (5 Wall.) 795, 807–08, 18 L.Ed. 653 (1866). Sometimes, courts went even further; "[f]or a long period in legal history it was supposed that any error in the course of a proceeding, no matter how minor or technical, required either the trial court or the appellate court to order a new trial." 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2881, at 271 (1973 & 1991 Supp.).

Viewing appellate courts as "impregnable citadels of technicality," Kavanagh, *Improvement of Administration of Criminal Justice by Exercise of Judicial Power*, 11 A.B.A.J. 217, 222 (1925), (quoted in WRIGHT & MILLER, *supra*, § 2881, at 271), legislatures and courts promulgated statutes and rules, such as Super.Ct.Civ.R. 61, which proscribed reversal unless the error complained of affected the appellant's substantial rights. In the seminal case of *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946), the Court, speaking through Justice Rutledge, articulated the standard to be applied pursuant to the 1919 federal "harmless error" statute as follows:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

(Citation and footnote omitted). "Fair assurance" was substituted for absolute certainty, as required in the earlier cases. The test is not whether the judgment was swayed at all, but whether it was "substantially" swayed.

*Kotteakos* was a criminal case, and it is not self-evident that its teachings should apply with exactitude to civil litigation. Indeed, the Senate Judiciary Committee initially recommended that the "harmless error" statute discussed in *Kotteakos*[12] apply exclusively to criminal cases. See S.Rep. No. 1066, 62d Cong. 2d Sess. (1912), cited in *Kotteakos, supra*, 328 U.S. at 762 n. 15, 66 S.Ct. at 1247 n. 15. As the Court observed in *Kotteakos*,

> [t]he statute in terms makes no distinction between civil and criminal causes. But this does not mean that the same criteria shall always be applied regardless of this difference.... Although the final form of the legislation was de-

---

12. That statute, as the Court recognized, contained language substantially identical for present purposes to that now found in Super.Ct.Civ.R. 61 and its criminal counterpart, Super.Ct.Crim.R. 52(a). *Id.* at 757 n. 9, 66 S.Ct. at 1244 n. 9.

signed, and frequently has been effective, to avoid some of the absurdities by which skillful manipulation of procedural rules had enabled the guilty to escape just punishment, [the harmless error statute] did not make irrelevant the fact that a person is on trial for his life or his liberty. It did not require the same judgment in such a case as in one involving only some question of civil liability.

*Id.* at 762–63, 66 S.Ct. at 1246–47 (footnote omitted).

The language of Super.Ct.Civ.R. 61 is, however, substantially identical in relevant respects to the criminal harmless error rule, Super.Ct.Crim.R. 52(a). Recognizing that, in the crunch, error that might be harmless in a civil case could be held prejudicial in a criminal prosecution in which the defendant's personal liberty is on the line, we agree that "the general discussion [in *Kotteakos*] of the attitude that judges should take seems fully applicable to civil litigation." 11 WRIGHT & MILLER, *supra*, § 2883, at 276.

> The problem of prejudicial error is a problem in professional psychology. No rules can be framed which will solve it, for rules can only be drawn in general

terms, and it is in the interpretation of the rules that the difficulty comes.

Sunderland, *The Problem of Appellate Review*, 5 TEX.L.REV. 126, 146–47 (1927) (quoted in 11 WRIGHT & MILLER, *supra*, § 2883, at 275 & n. 19).[13] In spite of the older decisions proclaiming the need for certainty, a commodity which is hard to achieve in any event,[14] we think that "fair assurance" as in *Kotteakos, supra,* represents a fair and workable standard[15] which we can profitably apply to this record.

■ We cannot say with "fair assurance" that the judge's ruling precluding R. & G. from calling an impeachment witness did not "substantially sway" the jury; *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248, nor is it "highly probable" that the error did not affect the verdict. THE RIDDLE OF HARMLESS ERROR, *supra,* at 35. Dr. Schultz was the only witness who testified that R. & G. was directed to use plastizote in preparing Ms. Brown's orthopedic shoes. Without that testimony, we think it unlikely that the case could even have gone to the jury, for R. & G. was a supplier, not a physician, and the gravamen of the case against it was its alleged failure to do what

---

**13.** *Compare* Chief Justice Roger J. Traynor's simple and direct formulation: "[U]nless the appellate court believes it highly probable that the error did not affect the judgment, it should reverse." R. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 35 (1970) (quoted in 11 WRIGHT & MILLER § 2883, at 275 & n. 20). As Chief Justice Traynor pointed out, "[a]ny test less stringent entails too great a risk of affirming a judgment that was influenced by an error. Moreover, a less stringent test may fail to deter an appellate judge from focusing his inquiry on the correctness of the result and then holding an error harmless whenever he equate[s] the result with his own predilections." *Id.*

**14.** "The law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions." *Lewis v. Ocean Accident & Guarantee Corp.,* 224 N.Y. 18, 22, 120 N.E. 56, 57 (1918) (per Cardozo, J.). But *compare E.I. duPont de Nemours Co. v. Berkley & Co., Inc.,* 620 F.2d 1247, 1258 n. 8 (8th Cir.1980) (applying "reasonable certainty" test) *with Fortunato v. Ford Motor Co.,* 464 F.2d 962, 967 (2d Cir.1972) ("[a]n appellate court will not reverse on the mere possibility that the exclusion [of evidence] was harmful") *cert. denied,* 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972)). Perhaps the

quoted language in *Fortunator* is best explained by the truism that anything is possible.

**15.** There are numerous and arguably conflicting decisions addressing the question whether error is presumed to be harmless or prejudicial, and with respect to the burden of proof on the issue. *Compare Palmer v. Hoffman,* 318 U.S. 109, 116, 63 S.Ct. 477, 482, 87 L.Ed. 645 (1943) ("[h]e who seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted") *with McCandless v. United States,* 298 U.S. 342, 347–48, 56 S.Ct. 764, 766, 80 L.Ed. 1205 (1936) ("an erroneous ruling which relates to the substantial rights of a party is ground for reversal unless it *affirmatively* appears from the whole record that it was not prejudicial") (emphasis in original). Justice Rutledge warned in *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248, against "attempting to generalize broadly, by presumption or otherwise." We agree with Chief Justice Traynor that it is

> the responsibility of the appellate court, once it concludes there was error, to determine whether the error affected the judgment. It must do so without benefit of such aids as presumptions or allocated burdens of proof that expedite fact-finding at the trial.

THE RIDDLE OF HARMLESS ERROR, *supra,* at 26.

Dr. Schultz had prescribed. Moreover, although other experts called by Ms. Brown testified that the applicable standard of care required the use of plastizote, Dr. Schultz was the only witness so testifying who actually treated Ms. Brown. Her testimony was critical to the case against R. & G., and her credibility was one of the principal issues at the trial. If R. & G. had been permitted to present Dr. Berman's testimony, it may well be that the jury would not have credited Dr. Schultz either with respect to whether she had prescribed plastizote or with respect to the importance which she attributed at trial to the use of that material in fabricating a diabetic's orthopedic shoe.[16]

Here, as in *Walker v. Firestone Tire & Rubber Co.*, 412 F.2d 60, 64 (2d Cir.1969).

> the trial court prohibited proper impeachment of the plaintiff's key witness. Since virtually the whole of plaintiff's case was based on [Dr. Schultz'] testimony, the error can only be regarded as material and significant.

Where credibility choices play a dominant role, our adversary system is designed to test the truth of evidence given at a trial. *Wright Root Beer Co. of New Orleans v. Dr. Pepper Co.*, 414 F.2d 887, 891 (5th Cir.1969). The unintentional skewing of that "basic concept" by the exclusion of Dr. Berman's testimony was prejudicial error. *Id.*

Moreover, the case against R. & G. was less than overwhelming. Dr. Schultz did not write plastizote on the prescription form issued to Charlotte Gottlieb, and it might reasonably be inferred that it was unlikely that she did so in the form designed for use by R. & G.. There was no corroboration of her claim that she directed R. & G. to use that material.

There were also problems with Ms. Brown's case against R. & G. in relation to the issue of causation. By her own testimony, Ms. Brown only wore the shoes provided to her by R. & G. on two separate days for a total of a little more than two hours. The evidence showed that she smoked, that she improvidently applied a hot water bottle to her foot, that she failed to follow medical advice, and that she checked out of the hospital when further treatment was indicated. The judge also found that Howard was negligent, and this finding potentially complicated (although it did not control) the question of proximate cause.

"In determining whether error was harmless, we must look to the closeness of the case, the centrality of the issue affected by the error, and any steps taken to mitigate the effects of the error." *Clark v. United States*, 593 A.2d 186, 193 (D.C.1991). This case was close, the error went to a central issue (the credibility of Dr. Schultz), and no remedial steps were taken. The error was prejudicial, not harmless.

— — —

In light of our disposition of R. & G.'s contention with respect to Dr. Berman's potential testimony, we need not reach the question whether the trial judge abused his discretion in refusing to permit R. & G. to amend its pretrial statement and to list Dr. McGlamry as an additional expert witness. Dr. McGlamry, who was not available for trial, had testified as a witness for Howard at a deposition which had been taken outside the District for use at the trial. In

16. To be sure, even if Dr. Berman had testified to an admission by Dr. Schultz that she did not specify plastizote on the R. & G. prescription, this would not necessarily have negated her claim that she gave oral directions to R. & G. that this material should be utilized. Moreover, her testimony had already been impeached by the absence of any reference to plastizote on the Charlotte Gottlieb prescription form. Accordingly, if Dr. Berman's testimony had been limited to Dr. Schultz's failure to specify plastizote on the prescription form, it would not have conclusively discredited Dr. Schultz.

Nevertheless, such testimony had substantial probative potential. Had Dr. Berman testified, the jury might well have disbelieved Dr. Schultz's assertion that "most likely" she prescribed plastizote in writing, as well as her testimony that she orally directed R. & G. to use it. Moreover, as a result of the judge's ruling excluding Dr. Berman's proposed testimony on procedural grounds, there was never any occasion for R. & G.'s attorney to spell out in detail the precise scope of that testimony.

response to questioning by counsel for plaintiff, he had, as we have seen, provided testimony favorable to R. & G., for it was his opinion that the failure to use plastizote was not a violation of the applicable standard of care.

Although this issue was briefed and argued to us as one that hinged on whether the trial judge should have permitted R. & G. to add Dr. McGlamry to its list of expert witnesses shortly before trial, it is not at all clear that any such motion was necessary. A deposition of a witness taken in conformity with Super.Ct.Civ.R. 32(a)(3), which deals with witnesses who are unable for various reasons to attend the trial, may by the terms of that Rule be "used by *any* party for any purpose." (Emphasis added). "Any party may use a deposition, not merely the party taking it." *McVay v. Cincinnati Union Terminal Co.*, 416 F.2d 853, 856 (6th Cir.1969); *see also Crist v. United States War Shipping Admin.*, 64 F.Supp. 934, 937–38 (E.D.Pa.1946). How this body of law interplays with the conceded absence of Dr. McGlamry's name from R. & G.'s list of expert witnesses is a question which may profitably be deferred to another day.

We note that the trial judge expressly, and we think correctly, considered Dr. McGlamry's deposition testimony in disposing of R. & G.'s cross-claim against Howard. In the event of a new trial, any prejudice resulting from the timing of R. & G.'s amendment of its pretrial statement will long have been dissipated. Accordingly, if Dr. McGlamry is once again unavailable to testify, the principal reason for barring the use of his deposition by either litigant will no longer apply.

### III

### THE CLAIM FOR INDEMNITY

■ Since we have held that R. & G. is entitled to a new trial with respect to the question of its own liability, it may be that R. & G.'s claim for indemnity will never be reached. If, at a new trial, R. & G. should receive a favorable verdict, its cross-claim against Howard will be moot. We ordinarily do not decide questions which depend on contingencies which may not arise. *Smith v. Smith*, 310 A.2d 229, 231 (D.C.1973). The parties have, however, fully briefed and argued the issue of indemnity and, unless we address it now, a second appeal would probably be necessary in the event of a second substantial verdict in Ms. Brown's favor. We therefore believe it to be "good judicial husbandry," *United States v. Dogan*, 314 F.2d 767, 772 (5th Cir.1963), to decide the point at this time.

Unfortunately, we are compelled to conclude that the trial judge's resolution of R. & G.'s claim for indemnity is internally inconsistent. Specifically, the findings in the text of his written order cannot, in our view, reasonably be reconciled with his findings in the footnote. Moreover, the legal consequences of the two apparently incompatible findings are critically different; R. & G. is entitled to indemnity or its equivalent if the text is correct, but only to contribution if the judge was right in the footnote.

### A. The judge's findings.

In order to assess the judge's disposition of the indemnity issue, it is necessary to set forth his findings in some detail. In the text of his order, the judge wrote as follows:

The court is satisfied, based on the evidence presented at trial and through Dr. McGlamry's deposition, that it preponderates in favor of a finding that both R. & G. and Howard were negligent in the care they rendered to plaintiff, and that the negligence of both R. & G. and Howard constituted proximate causes of plaintiff's injuries. In this regard, the court credits and finds persuasive the testimony of: (1) Dr. Patricia Schultz that she prescribed a custom-molded shoe with a plastizote insole for plaintiff; (2) plaintiff's expert, Dr. Peter Cavanaugh, that the shoe provided by R. & G. failed to comply with the prescription and violated the standard of care applicable to an orthotist such as R. & G.; and (3) plaintiff's experts, Dr. Clark Miller and Dr. David Morowitz, that, to a rea-

sonable medical certainty, the ulcers on plaintiff's foot were caused or complicated by the R. & G.—supplied improperly fitting shoe, *that they could have been resolved without the amputation of plaintiff's foot if Howard had hospitalized her on July 9, 1985,* and that the standard of care applicable to Howard required such hospitalization.

Consequently, the court concludes that R. & G. is entitled to judgment against Howard for contribution on its cross-claim, and that contribution should be assessed *pro rata, i.e.,* that R. & G. should be entitled to a credit in one half the amount of the verdict. *See Martello v. Hawley,* 112 U.S.App.D.C. 129, 132, 300 F.2d 721, 724 (1962).

(Emphasis added).

In a footnote, however, the judge added, in pertinent part, the following:

R. & G. asserts in its memorandum in support of its cross-claim, relying on law from other jurisdictions, that it not only is entitled to a credit against plaintiff's verdict based upon the settlement reached between plaintiff and Howard, but that it is entitled to full indemnification from Howard because any "original" injuries which R. & G. caused plaintiff were "profoundly worsened" by Howard.... Assuming without deciding that under District of Columbia law there conceivably might arise circumstances where a tortfeasor who proximately caused a plaintiff's injuries would be entitled to full indemnification from another joint tortfeasor who also proximately caused such injuries, this plainly is not such a case. *There is no basis in the evidence to conclude that Howard's conduct "worsened" plaintiff's injuries; to the contrary, the evidence shows that R. & G.'s conduct plainly would have led to the amputation of plaintiff's foot had Howard never entered the picture.* Here, the evidence shows that R. & G. and Howard were joint tortfeasors, that they were both guilty of "active negligence" in their care of plaintiff, and that their negligence concurred in causing her injury. *See Nordstrom v. District of Columbia,* 213 F.Supp. 315, 320 (D.D.C.),

*rev'd on other grounds,* 117 U.S.App. D.C. 165, 327 F.2d 863 (1963).

(Emphasis added).

We must, of course, approach the judge's findings with appropriate deference. A judgment may not be set aside except for errors of law unless it is "plainly wrong and without evidence to support it." D.C.Code § 17–305(a) (1989); *see also* Super.Ct.Civ.R. 52(a). The question is not whether this court would have found the facts as the trial court did, but rather whether "on the entire evidence we are left with the definite and firm conviction that a mistake has been made." *Cahn v. Antioch University,* 482 A.2d 120, 128 (D.C.1984) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969)). The problem here, however, is that if we defer to the judge's finding in the text, we must ignore his footnote; if we defer to the footnote, we contravene the finding in the text.

The internal inconsistency which we have discerned in the judge's findings is identified in the underscored language which we have quoted above. The judge's explicit statement in the text that the ulcers could have been resolved without amputation if Howard had exercised due care cannot reasonably be reconciled with his remark in the footnote that there was "no basis in the evidence to conclude that Howard's conduct worsened plaintiff's injuries," and that R. & G.'s conduct "plainly" would have led to the amputation of plaintiff's foot had Howard never entered the picture. It appears from the judge's finding in the text regarding Howard's negligence that, as a result of Howard's failure to hospitalize Ms. Brown, a patient who was readily treatable without amputation in July became one whose leg had to be amputated in October. This was surely a "worsening" of her condition, whether it resulted from Howard's affirmative acts or from its failure to act. Moreover, if Howard had not "entered the picture," Ms. Brown would presumably have been treated by some other doctor or podiatrist, and we must presume that there would have been no mal-

practice. *Cf. F.W. Woolworth Co. v. Williams,* 59 App.D.C. 347, 348, 41 F.2d 970, 971 (1930) (legal presumption is that due care was exercised). Thus, according to the judge's finding in the text, there would have been no amputation for which R. & G. could be held responsible.[17]

### B. Contribution and indemnity.

■ The law recognizes that there may not be a single proximate cause for every injury; several causes may combine to produce the harm. *Hill v. McDonald,* 442 A.2d 133, 137 (D.C.1982). Where the negligence of two defendants contributes to a single injury, both are jointly and severally liable, regardless of the degree of negligence on the part of each. *Id.* at 137–38. In such circumstances, however, a tortfeasor who has compensated the injured party may be entitled to recover from the second wrongdoer all or part of what he or she has expended. Recovery may be based on two principal theories, contribution and indemnity, or on various permutations of each doctrine.[18]

Contribution is the more common and more modest of these remedies. It is based on the quintessentially equitable notion that "as each tortfeasor was at fault in bringing about the injury to the innocent party, then in justice each tortfeasor should share [sic] his part in the burden of making the injured party whole again." *Martello v. Hawley,* 112 U.S.App.D.C. 129, 131, 300 F.2d 721, 723 (1962).

■ Generally, one tortfeasor is entitled to contribution from a second in the amount of one half of the award, and "the fact that the negligence of one may be greater than that of another does not give rise to a right of indemnity and does not

change the method of equally apportioning contribution." *Early Settlers Ins. Co. v. Schweid,* 221 A.2d 920, 923 (D.C.1966). The District is not a "comparative negligence" jurisdiction, and the rule that each tortfeasor ordinarily pays half is consistent with this approach. *Id.*

In *Martello,* as in this case, the plaintiff had settled with one of the tortfeasors and received judgment against the second. The court held that the non-settling defendant was entitled to contribution in the amount of one half of the verdict. 112 U.S.App. D.C. at 132, 300 F.2d at 724. In the present case, the trial judge, citing and following *Martello,* likewise held that R. & G. was entitled to a credit in one half of the amount of the verdict.

R. & G. contends, however, that contribution is an inadequate remedy on this record, and that it is entitled to indemnity. It claims that Howard was an "actively" negligent successor tortfeasor who was primarily responsible for the loss of Ms. Brown's foot, while R. & G.'s own negligence "actively" caused, at most, only the ulcerations and not the amputation.

This court recently had occasion to discuss in some depth the contours of the doctrine of indemnity. *See East Penn Mfg. Co. v. Pineda,* 578 A.2d 1113 (D.C.1990). Noting that the duty to indemnify often arises from a contract that provides for it, *id.* at 1126, we explained that such a duty may also exist in the absence of a contract where indemnification is required to prevent injustice. *Id.* We recognized that an obligation to indemnify may be implied in fact (on an implied contract theory) or implied in law in order to achieve an equitable result. *Id.* at 1127 n. 20. After discussing various traditional formulations (*e.g.,* active as against passive negligence, or primary

---

**17.** We do not think that the findings in the text and those in the footnote can properly be reconciled on the theory that Howard's negligence consisted of not hospitalizing Ms. Brown rather than of some new affirmative act, such as leaving a sponge in her stomach. Sins of omission, like those of commission, can aggravate pre-existing injuries; not treating the patient at all may have even more drastic consequences than treating her and doing so negligently. *See* discussion at page 547, *infra.*

**18.** *See Gertz v. Campbell,* 55 Ill.2d 84, 89–90, 302 N.E.2d 40, 43, 44 (1973) ("equitable apportionment" or "partial indemnity"); *Eagle–Picher Indus., Inc. v. United States,* 290 U.S.App.D.C. 307, 937 F.2d 625, 637 (1991) ("restitution indemnity"); W. PROSSER & R. KEETON, THE LAW OF TORTS, § 50, at 340–41 & n. 44 (1984).

as against secondary liability) and commenting upon the difficulties which courts have encountered in applying them, we quoted with approval the articulation of the concept by Prosser and Keeton:

> Indemnity is a shifting of responsibility from the shoulders of one person to another; and the duty to indemnify has been recognized in cases where the equities have supported it. A court's view of the equities may have been based on the relation of the parties to one another, and the consequent duty owed; or it may be because of a significant difference in the kind or quality of their conduct.

*Id.* at 1128 n. 20 (quoting W. PROSSER & R. KEETON, THE LAW OF TORTS, § 51, at 344 (1984)).

The fundamental question before us, as Prosser and Keeton have explained, is whether in the present case the equities support a requirement that Howard indemnify R. & G.. The correct answer to that question depends, in our view, on whether the findings in the text or the findings in the footnote rule the day.

### C. The findings in the text.

If the findings in the text of the judge's order are correct, then in July 1985, when Dr. Schultz failed to order hospitalization, Ms. Brown's condition was readily treatable without amputation. If Howard had exercised due care, there would have been no amputation.

If R. & G.'s negligence merely caused ulceration, but if amputation could have been avoided, then as between R. & G. and Howard, as a matter of equity, the responsibility of the latter for the amputation substantially outweighs the responsibility of the former, and Howard should be required to indemnify R. & G. with respect to so much of the injury, including the amputation, as is primarily attributable to Howard's malpractice. This is particularly true in light of Howard's responsibility to Ms. Brown over a long period of time both before and after R. & G.'s role, which responsibility included prescribing the very orthopedic shoes which precipitated R. & G.'s liability. Although this court has not

previously addressed the question whether a duty to indemnify arises in such a context, the proposition that Howard must indemnify R. & G. is supported by reason and by the overwhelming weight of authority. *See generally* Annotation: *Right of tortfeasor initially causing injury to recover indemnity or contribution from medical attendant aggravating injury or causing new injury in course of treatment,* 72 A.L.R. 4th 231, 238–48 (1989) (hereinafter 1989 annotation).

A hypothetical example demonstrates why this is so. Suppose that the plaintiff's hand is cut as a result of an initial tortfeasor's negligence. All that is required is to clean and dress his wound. If that were accomplished with due care, the plaintiff's injury would be minimal. Following the injury, however, a physician negligently fails to clean the wound, which becomes infected and gangrenous, so that the plaintiff's arm must be amputated. As between the plaintiff and the original tortfeasor, it arguably may be reasonable to require the latter to compensate the former for his entire injury. If no physician had entered the picture, the plaintiff would have lost his arm. As between the original tortfeasor and the negligent physician, however, there is no equity in requiring the former to pay half of that part of the plaintiff's compensation which is for the harm directly attributable to the physician's malpractice. Where one defendant was responsible for a minor injury and a second defendant's conduct was the effective cause of a major one, the first is unjustly penalized, and the second receives a windfall, if each must pay the same amount to the plaintiff.

In *Travelers Indemnity Co. v. Trowbridge,* 41 Ohio St.2d 11, 321 N.E.2d 787 (1975), a workman had been injured while on the job. The employer's insurer had made payments to the workman to compensate him for the loss. The insurer then sued the physician who had treated the workman, claiming that the physician's malpractice had aggravated the injuries. The insurer contended that the physician should be required to indemnify the insurer

for that portion of the damages directly to the physician's malpractice. The court, reversing the dismissal of the complaint below, held that "a tortfeasor who negligently causes an injury has a right to indemnity from a physician who negligently causes a new injury or aggravates the existing injury during the course of his treatment of the injury caused by the tortfeasor." *Id.* at 16, 321 N.E.2d at 790. Explicating its rationale, the court stated, in pertinent part:

> In the ordinary joint or concurrent tortfeasor situation, a single indivisible injury is produced, and each of the tortfeasors is charged with liability for the results of the negligence of the other, with no right of contribution or indemnity between them. . . .
>
> The physician and the tortfeasor are not typical concurrent tortfeasors but, rather, are more in the nature of successive tortfeasors.

*Id.* The court recognized that, as between the injured party and the original tortfeasor, the latter was liable for the entire injury, for the physician's intervening negligence had not broken the chain of proximate cause.[19] The court held, however, that as between the tortfeasor and the physician, the latter's responsibility was far more direct and far greater, and that the equities therefore required indemnification. Citing a prior annotation superseded by the 1989 annotation,[20] the court stated that

> almost all jurisdictions which have considered the issue have concluded that a tortfeasor who caused an initial injury has the right to recover indemnity from a physician who negligently either caused a new injury or aggravated the existing injury during the course of his treatment. . . . [T]he rationale, that he who actively causes an injury should be responsible to another who is liable for such injury because of his own negligence but who did not actively create

such injury, produces a just and equitable result.

*Id.,* 321 N.E.2d at 790.

In *Niles v. City of San Rafael,* 42 Cal. App.3d 230, 116 Cal.Rptr. 733 (1st Dist. 1974), Kelly, an eleven-year-old boy, was injured in a fight at the playground of his school. Employees of the City negligently failed to prevent the fight. After complaining of pain, the injured boy was transported to the emergency room of a local hospital, where signs and symptoms of severe head injury were observed by the treating physicians. In spite of this, Kelly was sent home with his father, apparently because a hospital representative erroneously believed that the boy could not be admitted because he was not being treated by a physician with staff privileges at the hospital. After Kelly's pulse rate fell, he was rushed back to the hospital. By the time the doctors were able to perform neurosurgery, however, he had become permanently paralyzed and mute.

The public entities which were alleged by Kelly to have negligently failed to prevent his injuries at the playground filed a cross-claim against the hospital for indemnity. The jury found that both the public entities and the hospital were negligent. On the cross-claim for indemnity, however, the jury apportioned the damages in the amount of $25,000 against the City and in the amount of $4,000,000 against the hospital. The appellate court upheld the verdict, reasoning as follows:

> The jury determined that the negligent acts of appellants and the public entities caused separate and identifiable damages; the evidence supports that determination. There was expert testimony that Kelly had an excellent chance of complete recovery if he had been properly treated when he first arrived at the hospital, and that Kelly's condition did not deteriorate to the point of permanent disability until after Kelly had been sent

---

**19.** R. & G. has not challenged on this appeal the judge's ruling that R. & G.'s negligence was a proximate cause of her entire injury. We therefore assume for present purposes that it was. *Cf.* Prosser & Keeton, *supra,* § 33, at 198; *Payne*

*v. Soft Sheen Prods., Inc.,* 486 A.2d 712, 726 (D.C.1985).

**20.** 8 A.L.R.3d 639 (1966), superseded by 72 A.L.R.4th 231, 233 n. 1.

away and had spent some time at his father's apartment.

*Id.* at 249, 116 Cal.Rptr. at 738.

█ It is noteworthy that in *Niles,* the hospital did not take any active steps which aggravated Kelly's condition. Rather, its negligence lay in failing to treat Kelly and to stem the tide of events which, without the intervention of a reasonably prudent physician, resulted in catastrophic injuries. *Niles* therefore cannot be reconciled with any notion that the duty to indemnify arises only if the physician affirmatively inflicts a new injury (*e.g.* by administering AIDS-infected blood in treating an abrasion). Aggravation of an injury by negligent failure to treat it, resulting in catastrophe, may also trigger the duty to indemnify, where equity and justice so require.

In *New Milford Bd. of Educ. v. Juliano,* 219 N.J.Super. 182, 530 A.2d 43 (1987), Karen, aged thirteen, was injured when a volleyball stanchion fell on her foot at school. Physicians who subsequently treated her allegedly so aggravated her injury that three of her toes had to be amputated. As in *Niles,* the Board of Education sought indemnity from the physician. Noting that no New Jersey court had previously decided a claim of indemnity on a comparable state of facts, the court analyzed the issue as follows:

A claim for indemnity by initial tortfeasors, such as plaintiffs, against successive tortfeasors, such as defendant doctors, is fundamentally different from a claim for indemnity by one joint tortfeasor against another. Plaintiffs do not seek to escape responsibility for their tortious conduct by holding defendant doctors liable for all damages incurred by Karen. *Rather, plaintiffs' claim is limited to the difference between what Karen's damages would have been if defendants had not committed malpractice and the full amount of damages which she suffered as a result of both the original accident and the subsequent malpractice.* It is clear that a tortfeasor is responsible for all damages

that naturally and proximately flow from the initial tort, including the consequences of medical malpractice in treating the injuries caused by his wrong.... However, in our view, the responsibility of an initial tortfeasor for the additional harm caused by subsequent medical malpractice is less immediate and less direct than the responsibility of the party or parties who have actually committed the malpractice. Indeed, the initial tortfeasor's responsibility for that additional harm can be viewed as a form of constructive or secondary liability.... Consequently, we conclude that justice requires recognition of plaintiffs' right to seek indemnification against defendant doctors.

*Id.* 219 N.J.Super. at 186–87, 530 A.2d at 45. (Emphasis added and citations omitted). The court stated that its conclusion was supported "by nearly all the decisions in other jurisdictions," and listed an impressive array of applicable precedents. *Id.,* 530 A.2d at 45.[21]

█ If the trial judge's findings in the text of his order in the present case are accepted as correct, then the reasoning of *Niles,* as well as *Trowbridge,* and *Juliano,* applies with equal force here. The negligence of R. & G. was responsible for Ms. Brown's ulcerations, and R. & G. is entitled to no indemnity or contribution for damages directly flowing from its negligence, up to the point that Howard's malpractice intervened. According to the judge's findings in the text, however, Howard's negligence converted Ms. Brown from someone whose foot did not require amputation into someone for whom such radical surgery was necessary. In that respect, the situation parallels the circumstances in the three cases cited, and the same result must follow. R. & G. therefore has the right to indemnity from Howard for "the difference between what [Ms. Brown's] damages would have been if [Howard] had not committed malpractice and the full amount of damages which she suffered as a result of both [R. & G.'s original negligence] and the

---

**21.** The authorities cited by the court in *Juliano* have analyzed the issue as raising a question of indemnity. A few courts, eschewing this articulation, have granted relief on a subrogation the-

ory. *See, e.g., Greene v. Waters,* 260 Wis. 40, 45–46, 49 N.W.2d 919, 921 (1951); 1989 annotation, *supra,* 72 A.L.R.4th at 245.

subsequent malpractice." *Juliano, supra,* 219 N.J.Super. at 186–87, 530 A.2d at 45.[22] If the question of indemnity is not mooted, and if the judge reiterates the findings in the text of his order, then he will be obliged to calculate and apportion damages as contemplated in *Juliano.*[23]

### D. The findings in the footnote.

The legal consequences are entirely different, however, if the facts are as found in the judge's footnote. If "R. & G.'s conduct plainly would have led to the amputation of plaintiff's foot had Howard never entered the picture," and if the "active" negligence

of both defendants "concurred in causing [Ms. Brown's] injury," then the judge's disposition of the cross-claim was plainly correct. Under those circumstances, there is no equitable basis for a claim of indemnity, and no inquiry is to be made with respect to the issue of comparative fault. *Martello, supra,* 112 U.S.App.D.C. at 132, 300 F.2d at 724; *Schweid, supra,* 221 A.2d at 923.[24]

## IV

## CONCLUSION

For the foregoing reasons, the judgment is reversed and the case is remanded for a

---

**22.** Ms. Brown seeks to distinguish the authorities cited by R. & G. upon the ground that, in some of them, the claim for indemnity was made in a separate suit. We find this distinction unpersuasive; a claim for indemnity made early in the process should not receive less favorable treatment than one made later.

Ms. Brown points out that in the present case, the jury has already determined that R. & G.'s negligence proximately caused her injuries. This is true, and leads to the eminently fair result that, as between Ms. Brown and R. & G., the loss should be borne by R. & G., as the party which the jury found to be negligent. Nevertheless, as between the two negligent parties—R. & G. and Howard—that defendant who could and should have prevented the deterioration of the patient's condition must indemnify that defendant whose role in the infliction of that part of the injury was far more remote. That, we think, is the teaching of the authorities discussed in this opinion.

Ms. Brown also argues that in the present case, the actions of R. & G. and Howard were "directly interrelated from the start of the plaintiff's problems." Assuming without deciding that this statement is correct, it provides no solace to Ms. Brown. According to the judge's findings in the text of his order, Howard could have avoided amputation of Ms. Brown's foot at a time when R. & G. no longer had any connection with her treatment. If the actions of the two defendants were closely connected at an earlier time, they were not so interrelated at the critical time.

**23.** Lest our decision be misconstrued, we are not holding that every physician who negligently fails to stem the harm done by an injury inflicted by an initial tortfeasor is always required to indemnify the earlier wrongdoer. Indemnity is an equitable doctrine, and each case must turn on its own circumstances. In the present instance, however, Howard's role in the treatment of Ms. Brown predated R. & G.'s and resumed shortly after the orthopedic shoes were prescribed. Howard had a great deal more to

do with the patient than R. & G. did. According to the judge's findings in the text of his order, the expansion by Howard of the relatively less devastating injury inflicted by R. & G. into a drastic one requiring amputation would have been avoided by the exercise of due care. Finally, the injury suffered by Ms. Brown is readily divisible into the harm suffered prior to Howard's failure to hospitalize her and the more drastic later consequences, including amputation. We have no occasion to decide whether the same result would follow in the absence of some of these factors.

**24.** The trial judge will have to determine in the first instance whether the evidence may fairly be viewed as supporting the findings in the footnote. R. & G. makes a persuasive case, however, for the proposition that the evidence tends to contradict those findings. Indeed, R. & G. makes a plausible argument for the proposition that any finding that amputation would have been necessary, irrespective of what Howard did, would be clearly erroneous.

Dr. Morowitz and Dr. Miller both testified rather unequivocally on behalf of the plaintiff that due care on the part of Howard would have saved Ms. Brown's foot. Ms. Brown relies primarily on the testimony of Dr. Schultz, who stated that Ms. Brown's ulcers became very aggressive and never healed. This is a far cry, however, from a showing that timely hospitalization and treatment could not have healed them.

Ms. Brown also argues that Dr. Morowitz wavered in his opinion that Ms. Brown's leg could have been saved, stating on one occasion that expeditious treatment *"probably"* would not have resulted in the avalanche of events that terminated in amputation." This statement by Dr. Morowitz reflects his view that Howard's negligence "probably" and not "certainly" worsened Ms. Brown's condition. We think that Dr. Morowitz' comment is a slim reed upon which to attempt to rest a finding that the foot could not have been saved.

new trial. In the event that, following a new trial, R. & G.'s cross-claim for indemnity has not been rendered moot, the trial judge shall clarify his findings with respect to the cross-claim and, if necessary, modify his disposition in accordance with this opinion.

*So ordered.*