**3511 13TH STREET TENANTS' ASSO-CIATION and Steven Madeoy, Appellants/Cross–Appellees,**

v.

**3511 13TH STREET, N.W. RESIDENCES, LLC, et al., Appellees/Cross–Appellants.**

Nos. 06–CV–65, 06–CV–66 and 06–CV–184.

District of Columbia Court of Appeals.

Argued March 14, 2007.

Decided April 19, 2007.

Robert E. Greenberg, with whom Thomas F. Murphy and Hassan A. Zavareei, were on the brief, Washington, DC, for appellants/cross-appellees.

Steven D. Campen and Alan B. Sternstein, with whom Morton A. Faller, Rockville, MD, was on the brief, for appellees/cross-appellants.

Before FARRELL and RUIZ, Associate Judges, and SCHWELB, Senior Judge.

FARRELL, Associate Judge:

These consolidated appeals arise from three related actions in Superior Court: a suit for specific performance by Steven Madeoy against the former owner of an apartment building at 3511 13th Street, N.W., who Madeoy alleged had agreed to sell him the building; a counter-suit by the former owner and the purchaser of the building against Madeoy alleging, *inter alia*, that he had tortiously interfered with their contract for sale of the building; and an action to rescind this contract filed by a tenants' association representing tenants of the building, alleging that they had not been given notice of the sale and an opportunity to purchase their units as required by D.C.Code § 42–3404.02 *et seq.* (2001).

The trial judge granted summary judgment against Madeoy in his suit for specific performance, concluding that his alleged contract to purchase was not supported by valid consideration. The other two actions were tried to a jury, following which the

judge dismissed the counter-suit against Madeoy on motion for judgment as a matter of law, and the jury rejected the tenants' claim that they had not been given the required statutory notice.

On these respective appeals by Madeoy and the tenants' association,[1] we hold that the judge erred in concluding as a matter of law that Madeoy had entered into, at most, "an executory contract that was not supported by valid consideration." Triable issues of fact remain concerning whether Madeoy's promise to perform was—in the judge's words—"a mere pretense and not a reality" and whether, assuming a valid contract, Madeoy's failure to make an earnest money deposit as promised was a material breach that excused the seller from performance. We affirm the jury verdict against the tenants' association.

## I.

Sonnythia Lewis was the owner of the property in dispute at 3511 13th Street, N.W., a multi-unit apartment building occupied by tenants. Steven Madeoy owned or controlled an adjoining property and wanted to buy the 3511 13th Street building from Lewis, who was having financial problems. When Mark Tillmon, a self-described consultant/finder (or "bird dog") for Madeoy, told him that Lewis was ready to sell the building, Madeoy drew up a contract offer to buy it for $1.3 million in cash. The contract specified a closing date of January 16, 2003, and stated that an earnest money deposit of $25,000 was required and had been "[r]eceived." Lewis signed the contract on January 4, 2003, twelve days before the scheduled closing. According to Madeoy's later deposition, he immediately wrote a check for $25,000 to the "Tillmon Companies" as called for in the contract and gave it to Tillmon to deposit with the settlement company. Tillmon, however, acknowledged at his deposition that he had not deposited the check and in fact had "lost it."

Madeoy claimed that he went to the settlement attorney's office on January 13, 2003, to conclude his side of the transaction, but that settlement could not take place because a cloud on the title had been discovered. In particular, there was an outstanding contract for sale of the property by Lewis to one Arthur Coleman, who later rejected Madeoy's offer of $50,000 for a release of that contract. On April 22, 2003, facing foreclosure on the property, Lewis declared bankruptcy, but on June 14, 2003, she contracted to sell the property to an entity controlled by Christine Nuyen for $1,545,000.[2]

That same day, Madeoy sued Lewis for breach of contract and specific performance, and sued Nuyen for tortious interference with his contract to purchase from Lewis. Lewis and Nuyen counter-sued Madeoy for interfering with their contractual arrangement (as well as for slander of title for having filed a *lis pendens* notice). Finally, tenants of 3511 13th Street formed a "tenant organization" under D.C.Code

---

1. The defendants in the tenants' action for rescission have filed a protective cross-appeal in the event error is found in the jury's verdict in that case. In view of our disposition of the appeals, it is unnecessary to reach the issues raised by the cross-appeal.

2. The record does not indicate what became of the contract between Lewis and Coleman. However, on May 8, 2003, Lewis had executed yet another contract to sell the building to Centennial Development for $1,350,000. Although that sale did not proceed to settlement, the notices Lewis claimed to have given the tenants in connection with it formed the basis for her assertion, which the jury accepted, that she had complied with the notice and right-of-first refusal provisions of the Rental Housing Conversion and Sale Act, D.C.Code §§ 42–3404.02 *et seq.* (2001).

§ 42–3404.11 and intervened in Madeoy's suit for specific performance,[3] seeking rescission of the Lewis–Nuyen contract on the ground that they had been denied notice of the sale offer and their right of first refusal secured by § 42–3404.08.

After the trial judge entered judgment as a matter of law against Madeoy (and against Lewis and Nuyen on their counter-suit), and the jury returned a verdict against the tenants, these appeals were taken.[4]

## II.

As explained, the judge granted summary judgment against Madeoy because, in the judge's words, his contract to buy the property from Lewis "was not supported by valid consideration." The judge gave essentially two reasons for this conclusion. First, Tillmon, "acting as the go-between for [Lewis] and [Madeoy,] never deposited [the earnest money] check as required by law." Citing the escrow requirements of D.C.Code § 42–1704(a),[5] the judge reasoned that to recognize Madeoy's contract offer as valid when he and his

agent neither deposited nor delivered the earnest money check "would circumvent the regulatory scheme." More broadly, the judge relied on the principle that "a stated consideration which is a mere pretense and not a reality is not sufficient; because if in fact no consideration was intended and none given, recital of a consideration cannot make the promise enforceable," quoting *Allen v. Allen*, 133 A.2d 116, 118 (D.C.1957). That proposition, in the judge's view, "describes precisely the situation presented [here]," where Madeoy "drew up a contract offer" falsely stating that "Lewis had received $25,000," where, indeed, he did not intend "to give Lewis a negotiable check for $25,000" because he "knew that Lewis was in danger of imminent foreclosure" (and presumably hoped to acquire the property by that route), and where, accordingly, the check Tillmon received as intermediary was not one he could reasonably view as "anything more than a worthless piece of paper."

■ ■ We hold that neither ground stated by the judge permitted rejection of

---

3. Evidence at trial established that in return for assignment of their rights to purchase to Madeoy, *see* D.C.Code § 42–3404.06, the tenants who intervened in his suit were each to receive a total of $45,000 from Madeoy per rental unit, the bulk of the payments conditioned upon the success of either his suit for specific performance or their action to rescind the Lewis–Nuyen contract.

4. For simplicity's sake, we refer to the appellant/cross-appellee "3511 13th Street Tenants' Association" throughout as "the tenants." Instead of "3511 13th Street, N.W. Residential, LLC," we refer to the appellees/cross-appellants as "Lewis and Nuyen."

5. Section 42–1704 states in relevant part:

(a) In any real estate transaction in which any person is entrusted, receives, and accepts, or otherwise holds or deposits monies or other trust instruments, of what-

ever kind or nature, pending consummation or termination of the transaction involved, whether or not the person is required to be licensed under this subchapter, the monies, in the absence of written instructions to the contrary signed by all parties to the transaction, shall be:

(1) Deposited within 7 days in an account in a financial institution located within the District whose deposits are insured either by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, or their successors;

(2) Maintained by the escrow holder or trustee as a separate account for monies belonging to others; and

(3)(A) Retained in an account until the transaction involved is consummated or terminated, or until proper written instructions have been received by the escrow holder or trustee directing the withdrawal and disposition of the monies. . . .

Madeoy's suit on summary judgment. That relief may not be granted unless "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Woodland v. District Council 20*, 777 A.2d 795, 798 (D.C.2001). Here the depositions and other materials reveal genuine factual issues about whether Madeoy intended to be bound by his promise to buy the property from Lewis or whether his promise was "a mere pretense and not a reality," *Allen, supra*, and alternatively about whether his alleged failure to deliver the earnest money check would constitute a material breach of the contract excusing Lewis from further performance. Those issues must be tried to a jury. Moreover, any disregard of § 42–1704(a) by Madeoy or Tillmon did not render the contract invalid as a matter of law.

■ In general, " '[a] promise is a sufficient consideration for a return promise. This has been true for at least four centuries, ever since bilateral contracts were recognized.' " *Jacobson v. Jacobson*, 277 A.2d 280, 282 (D.C.1971) (quoting 1 A. CORBIN, CONTRACTS § 142, at 611 (1963)). For that reason, "[t]here is no legal requirement that there be a [deposit or] down payment—the mutual promises supply the consideration," and even where "the recital of a down payment is untrue" because "the buyer had not yet paid[, s]uch a contract is nevertheless enforceable." FRIEDMAN ON CONTRACTS AND CONVEYANCES OF REAL PROPERTY § 1.4.4, at 1–27 (7th ed. 2006). *See also, e.g., Peterson*

*Homes, Inc. v. Johnson*, 691 So.2d 563, 564 (Fla.App.1997) ("The consideration which creates a valid contract for the sale of real property is the purchaser's promise to pay"; rejecting argument that because buyer "failed to pay the [promised] $600,000 deposit, the parties' agreement lacked the consideration necessary to create a binding contract."); *Century 21 All W. Real Estate & Investment Inc. v. Webb*, 645 P.2d 52, 55 (Utah 1982) ("[T]he agreement contained mutual promises, which provide adequate consideration to make the agreement binding"; "[w]e cannot agree ... that the Earnest Money agreement failed for lack of consideration because the seller ... never received the $100 deposit."); *Cowman v. Allen Monuments, Inc.*, 500 S.W.2d 223, 227 (Tex.Ct. Civ.App.1973) (same).[6]

■ Nothing in the contract between Madeoy and Lewis stated or implied that the earnest money deposit was a condition precedent to formation of a binding contract, rather than a possible condition upon "the seller's duty to perform." FRIEDMAN ON CONTRACTS, *supra*. In concluding nevertheless that Madeoy's failure to deposit the earnest money made the contract "executory" because "not supported by valid consideration," the judge relied first on the statute codifying the duty of an "escrow holder" such as Tillmon to deposit entrusted funds in a financial institution. *See* § 42–1704(a), *supra*. But the requirements of that statute do not purport to affect the validity of a real estate contract between a buyer and seller. Part of a

---

6. *Prudential Preferred Props. v. J & J Ventures, Inc.*, 859 P.2d 1267 (Wyo.1993), relied on by Lewis and Nuyen, is not to the contrary. There a listing broker, which sued the maker and guarantor of a promissory note that represented a down payment for the purchase of property and was made payable to the broker as escrow agent, had itself "not provide[d] any performance *or return promise* to any

third party sufficient to constitute consideration in return for the maker's and guarantor's promises to pay." *Id.* at 1273 (emphasis added). Here, apart from the claim by Lewis and Nuyen that Madeoy's promise was a "mere pretense" or "sham," which we consider later, Madeoy's promise to purchase was consideration sufficient to create a contract.

code chapter establishing "Real Estate Brokers' Duties," the statute requires a deposit in the prescribed manner by "any person" (licensed or not) entrusted with monies pending completion of the real estate transaction. Beyond serving as a basis for potential civil liability of the person (or loss of license in the case of a licensed broker) who does not deposit entrusted funds as required, *see, e.g., Marmac Inv. Co. v. Wolpe,* 759 A.2d 620 (D.C.2000), the statute subjects that person to the "additional criminal penalties," § 42–1708, provided for violation of any provision of the chapter. But nothing in the language of the statute implies that the legislature meant to invalidate real estate contracts solely because a third person—a broker or other intermediary—failed to maintain escrowed funds in the manner prescribed.

The judge's broader reason for invalidating the contract was his determination that the "stated consideration" was "a mere pretense and not a reality," quoting *Allen, supra.* In effect, the judge concluded that Madeoy never intended to be bound by his promise to pay $1.3 million for the property (he knew, after all, that Lewis "was in imminent danger of foreclosure"), and that the falsity of the specific promise to provide $25,000 in earnest money evidenced the "pretense" of his commitment. As *Allen* illustrates, there may indeed be situations where "sham consideration"—a "fals[e] ... recital that something has been paid or done"—serves to invalidate the consideration and as a result the contract. 2 CORBIN ON CONTRACTS § 5.17, at 83 (rev. ed. 1995); *see also* RESTATEMENT (SECOND) OF THE LAW, CONTRACTS § 71 cmt. b., at 173 (1981) ("[A] mere pretense of bargain does not suffice, as where there is a false recital of consideration"). But even as-

suming, as the judge evidently believed, that Madeoy's failure to deposit the earnest money could suffice as proof that his promise to purchase was "mere pretense," we do not see how that issue could fairly be resolved on summary judgment rather than by a trier of fact.[7]

■ In essence, what the judge perceived to be at issue was Madeoy's motive or intent—a possibly fraudulent, or at least insincere, attempt to induce Lewis to contract, perhaps to forestall other offers for the property pending a possible foreclosure. In general, however, summary judgment is "not appropriate and should be granted sparingly in cases involving motive or intent as material elements." *Young v. Delaney,* 647 A.2d 784, 790 (D.C.1994); *see also, e.g., Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 368 (D.C.1993) ("[M]otive is question of fact for the jury (or the judge in a non-jury trial), and, like other types of claims in which motive or intent is in issue, is not well suited to disposition on a motion for summary judgment."). Madeoy stated in his deposition that he had tendered a check for the earnest money and had presented himself at the settlement attorney's office ready to close on the property barely nine days after Lewis signed the contract, only to learn that settlement could not go forward because Lewis had allowed an existing contract with Arthur Coleman to cloud the title. He further claims that he tried unsuccessfully to remove the cloud by paying Coleman $50,000 for a formal release of the other contract. These and other circumstances Madeoy proffered make it impossible to conclude on summary judgment that he never intended to carry out the promise to buy, even if he was insincere in that part of the promise related to the earnest

7. In *Allen,* for example, this court sustained the trial court's finding *as* trier of fact, after receipt of "parol evidence" contradicting the "[r]ecital of consideration," that the promised consideration was neither "intended [nor] given." 133 A.2d at 118.

money deposit. Rather, triable issues of fact must be resolved before any conclusion can be drawn that the contract failed because of the "sham" nature of Madeoy's promise.

The same result applies if we view the issue not as one of consideration, but rather of whether, assuming a valid contract, Madeoy materially breached it by not tendering an earnest money payment, thereby relieving Lewis of any duty to perform. Whether a particular breach of a contract is "material" is a classic issue of fact. *See, e.g., Camalier & Buckley, Inc. v. Sandoz & Lamberton, Inc.,* 667 A.2d 822, 829 (D.C.1995) (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)); *Miller v. Mills Constr., Inc.,* 352 F.3d 1166, 1172 (8th Cir.2003); *Sahadi v. Continental Illinois Nat'l Bank & Trust Co.,* 706 F.2d 193, 196 (7th Cir.1983) ("[T]he determination of 'materiality' is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties."); *Ranes v. American Family Mut. Ins. Co.,* 219 Wis.2d 49, 580 N.W.2d 197, 200 (1998) ("For a breach to be material, it must be so serious to destroy the essential object of the agreement."). Depending on the facts, the breach of an obligation to make an earnest money deposit may well be material and excuse further performance by the seller. *See, e.g., Greentree Props., Inc. v. Kissee,* 92 S.W.3d 289 (Mo.Ct.App.2002) (the failure to deliver the earnest money within the prescribed period of time after repeated requests was a material breach); *Vacova*

*Co. v. Farrell,* 62 Wash.App. 386, 814 P.2d 255 (1991) (the buyer's failure to pay the $60,000 deposit within the 3–day prescribed time period was a material breach); *Green River Valley Found., Inc. v. Foster,* 78 Wash.2d 245, 473 P.2d 844 (1970) (buyer delivered the earnest money 37–days late after several requests).[8] But here the evidence on materiality of the alleged breach is not "so one-sided that [Lewis] must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Among other things, settlement on the property was scheduled for only two weeks after the date of contract, and the earnest money payment Madeoy was required meanwhile to make was for a tiny fraction of the purchase price. These are factors a jury could weigh in deciding that, if Madeoy was otherwise prepared to close on January 13, the failure to make the deposit was not a breach material enough to excuse performance by the other party. Lewis counters that Madeoy's non-performance went beyond failure to tender the deposit, *i.e.,* he "took no steps ... to require [Lewis] to clear title" over the next several months (Br. for Lewis at 16). But, again, a jury could reasonably find that Lewis, as the party who had agreed to furnish clear title, should not be permitted to convert her own inaction into a material breach by Madeoy, particularly if the jury were to believe that Madeoy had made several attempts to close on the deal. We express no opinion on the correct answer to these questions, which are the sort we properly rely on juries to decide.[9]

8. *See also Rawcliffe v. Aguayo,* 108 Misc.2d 1027, 438 N.Y.S.2d 697 (1981) (buyer forfeited right to sue for specific performance after his down-payment check was returned for insufficient funds; citing principle that "[a] material breach of a real estate contract excuses the other party's performance and gives rise to a right of rescission").

9. Similar issues of fact exist regarding Lewis's claim that Madeoy's actions constituted "anticipatory repudiation" of the contract. *See Keefe Co. v. Americable Int'l, Inc.,* 755 A.2d 469, 475 (D.C.2000); *see also* 23 WILLISTON ON CONTRACTS § 63:15 (4th ed. 2002) ("question whether a party has repudiated a contract is one of fact").

For these reasons, the judge erred in granting summary judgment against Madeoy on his suit for specific performance.

## III.

By the parties' agreement, the tenants' suit for rescission of the Lewis–Nuyen contract was submitted to the jury on the single question of whether "plaintiff 3511 13th Street, Tenants' Association, Inc. [has] proven by a preponderance of the evidence that defendant Sonnythia Lewis did not give notice as required by posting and mailing to the tenants of an offer of sale for the housing accommodation at the address on May 8, 2003." The May 8 date, which referred to Lewis's testimony that she had notified each tenant on that date in connection with her aborted sale of the property to Centennial Development, see note 2, *supra*, was key because the parties agreed that notice of that sale offer would serve as notice for the contract a month later between Lewis and Nuyen.[10] The jury found that the tenants had not proven lack of notice, and on appeal they do not argue that the verdict was unsupported by or against the weight of the evidence. Instead, they assign three errors in the judge's conduct of the trial, none of which, we conclude, justifies disturbing the jury's verdict.

### A.

The tenants argue that the judge erroneously admitted into evidence (and gave the jury as an exhibit for its deliberation) a June 24, 2003 letter from Linda Harried, an official with the District's Department of Consumer and Regulatory Affairs (DCRA), to Sonnythia Lewis stating that the agency's file showed that statutory no-

tice (of the Centennial Development offer of sale) had been "properly delivered to the tenants." Although Lewis and Nuyen originally sought admission of the document as a business record, they do not dispute on appeal that they failed to lay the basis for that hearsay exception, and that, accordingly, the letter could not be admitted for the truth of the assertion just mentioned. But they point out that the judge expressly told the jury in his final instructions that the document had been admitted "for a limited purpose relating to an issue that I have to decide" and that the jury was "not to consider ... reference[s] to that letter in any way as proof that the tenants actually ... receive[d] the notice required be given them before the owner sold the building." The tenants respond that if the letter's only relevance was to an issue the judge and not the jury "[had] to decide," it should not have been put before the jury, and that despite the quoted limiting instruction jurors might have looked to its contents as substantive evidence of notice, especially when the judge had earlier told them confusing things such as that the letter could be given "whatever weight, value you think is appropriate" even if it did "not prove the question that you have to resolve."

On review, we conclude that there was, indeed, no reason for the judge to admit the Harried letter into evidence. Christine Nuyen had testified that she went through with the purchase of the building from Lewis partly relying on Harried's letter. But the parties agreed that Nuyen's reliance or not was relevant only to the equitable remedy of rescission the tenants were seeking—an issue of remedy which the judge would decide only if the

10. The parties agreed, specifically, that because the price offered by Nuyen exceeded Centennial's earlier offer, an exercise by the tenants of their right not to purchase the building on the first occasion would obviate the need for notice of the subsequent sale offer.

jury first found that the tenants had not been given the statutory notice. It is not apparent, therefore, why the letter needed to be placed in evidence when its conceded relevance was to an issue the court and not the jury was to decide. Once it became apparent that Lewis and Nuyen could not establish the non-hearsay basis for its admission as a business record, the judge should have removed it as an exhibit rather than leave matters to an instruction that it was irrelevant to the only issue before the jury.[11]

■ We nevertheless are satisfied that the erroneous admission of the letter did not influence the outcome of the jury's deliberations. *See, e.g., R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 538–40 (D.C.1991). First, the fact remains that the judge told the jurors, in the end, that they were not to consider the letter as proof of notice, just as he had repeatedly—though somewhat ambiguously—told them earlier that the letter was "not the answer to ... the question as to whether notice was given." Second, although the letter was submitted to the jury as one of numerous exhibits, no witness testified to the assertion it contained that notice had been "properly delivered to the tenants." Equally important, neither defense attorney—for Lewis or Nuyen—cited the letter as proof of notice in their combined forty transcript-pages of closing argument on the issue. To the contrary, the sole mention of it (by Nuyen's counsel) told the jury that "the letter from the DCRA ... *does not show that the notice was sent on May 8.* What it does show i[s] that it was a document ...

upon which [Ms. Nuyen] relied to purchase ... the property." (Emphasis added.) The jury thus learned from the defense team itself why the letter was irrelevant—in the same attorney's words—to the "simple, simple issue [the jury had] to resolve" of whether "notice was sent." Finally, the jury had heard detailed testimony by Lewis and her realtor, Angela Williams, about the steps they had taken to provide notice by mail and posting on or about May 8. While the tenants point to inconsistencies in their testimony, these may well have been neutralized by testimony impeaching the tenant-witnesses' own denial of having received notice—including the evidence that they would receive substantial cash payments from Madeoy partly contingent on the success of their suit to rescind. See note 3, *supra.*

For these reasons, we can "say with 'fair assurance' that the judge's" erroneous admission of the letter "did not 'substantially sway' the jury[s]" determination that the tenants had not met their burden of proof. *R. & G. Orthopedic,* 596 A.2d at 540 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

### B.

The tenant's remaining two arguments may be dealt with more summarily. They contend first that the judge's delay in granting Madeoy's motion to dismiss the counter-suit by Lewis and Nuyen for abuse of process until after evidence was presented on that claim prejudiced them in the eyes of the jury. This, they assert,

---

11. Lewis and Nuyen argue that the letter was relevant to Lewis's "credibility" in testifying that she had given the required notice. The objection to the letter's contents, however, was not on relevance grounds but to their hearsay character, when no one had established the letter's trustworthiness as a business record. Contrary to the defendants' argument, when counsel for Madeoy elicited from Lewis only that she had written Linda Harried informing her that notice had been given, he did not "open the door" to admission of the hearsay contents of Harried's response.

was because Madeoy's purchase of the tenants' rights tended to equate him with them in the litigation,[12] and the evidence proffered to support the abuse of process claim was designed "to paint a negative image of Madeoy" (Br. for Tenants' Assoc. at 19). The argument thus appears to be that the judge should have bifurcated the two proceedings or at least allowed resolution of the tenants' notice claim before Madeoy's character was put in issue by the counter-suit.

Beyond the conjectural nature of this claim of prejudice, however, the dispositive point is that the tenants did not seek bifurcation of the two actions before trial and did not object when the judge, having denied their motion to dismiss, permitted Lewis and Nuyen to present their case first before the tenants' presented their proof of lack of notice.[13] Indeed, after the judge dismissed the counter-suit at trial, he told the jury that "the evidence that you heard regarding the claim of abusive process, which is no longer before you for decision, you would have heard anyway as part of this case [alleging lack of statutory notice]" and "you will consider that evidence as part of the context for that decision you'll make"—and again the tenants voiced no objection. We therefore reject, as the afterthought it essentially is, the tenants' claim of unfair amalgamation of the evidence.

Finally, the tenants argue that the trial judge erred in declining to instruct the jury, at their request, that "ambiguities" in the evidence as to whether or not

they had received notice had to be resolved in their favor. The tenants derive their claim of right to that instruction from D.C.Code § 42–3405.11, which states that "[t]he purposes of this chapter favor resolution of ambiguity by the hearing officer or a court toward the end of strengthening the legal rights of tenants or tenant organizations to the maximum extent permissible under law." The tenants confuse statutory interpretation with the factual issue the jury had to decide of whether they had been given the notice the statute requires. Section 42–3405.11 is entitled "Statutory construction," and questions of "ambiguity" in a statute—and in whose favor a court must resolve them—are the province of the court (or an administrative agency) to answer as a matter of statutory interpretation. *See, e.g., Board of Dir. of the Washington City Orphan Asylum v. Board of Trustees of the Washington City Orphan Asylum,* 798 A.2d 1068, 1080 n. 14 & accompanying text (D.C. 2002). By contrast, whether the tenants had been given notice as required was, as the parties agreed at trial, to be governed by the traditional standard of preponderance of the evidence, on which the tenants had the burden of proof.

The tenants implicitly concede this point, we think, when they point to "crucial ambiguities" in the statute including "whether the notice is required to be posted in any particular language," such as Spanish (Br. for Tenants' Assoc. at 21). Issues of that kind by their nature require interpretation of the statute or related regulation,[14] which a court undertakes using

---

12. At one point, in fact, counsel for Nuyen told the jury in summation: "[L]et there be no dispute. It may be called *Tenants' Association v. Nuyen.* This is really *Madeoy v. Nuyen.*"

13. Hearing no objection, the judge allowed this order of proof after Nuyen's counsel pointed out that her suit had been filed first

and that the tenants, instead of filing a separate suit, had "intervened in our case" with their action to rescind the contract.

14. *See* DCMR § 4701.4 (requiring "[a] Spanish translation of that information [the request to tenants for election] to be sent to

the normal aids to construction such as legislative history.  But the tenants did not ask the court to resolve any of the issues of ambiguity they now cite (nor to instruct the jury accordingly).  Their effort to have the jury made the arbiter of what the legislature intended is unpersuasive.

*Affirmed in part and reversed in part, and remanded for trial on the suit for specific performance.*

each household where Spanish is the primary    language'').