*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 22-CV-636 & No. 22-CV-645

Hto7, LLC, APPELLANT/CROSS-APPELLEE,

v.

ELEVATE, LLC, APPELLEE/CROSS-APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2020-CA-003769-B)

(Hon. Jason Park, Trial Judge)

(Argued November 16, 2023            Decided August 1, 2024)

*Brett A. Berman*, with whom *Kristen Ward Broz* was on the brief, for appellant/cross-appellee.

*Matthew J. MacLean*, with whom *Katherine T. Danial* was on the brief, for appellee/cross-appellant.

Before BLACKBURNE-RIGSBY,[*] *Chief Judge*, and BECKWITH and DEAHL, *Associate Judges*.

---

[*] Associate Judge AliKhan was originally assigned to this case. Following Judge AliKhan's appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Chief Judge Blackburne-Rigsby was assigned to take her place on the panel.

DEAHL, *Associate Judge*: This is a commercial lease dispute between a landlord, Hto7, LLC, and its former tenant, Elevate, LLC. It is undisputed that Elevate terminated their lease agreement two years and three months into an eleven-year term. This dispute centers around whether Elevate was justified in doing so because Hto7 had previously materially breached the lease agreement when it failed to return, after several months of demands, a $38,000 security deposit that it was required to refund to Elevate after year two of the lease.

The case went to trial, and the trial court did not address whether Hto7's failure to return the $38,000 security deposit constituted a material breach of the lease agreement. It instead reasoned that it did not matter, because a "No Rental Offset" provision in the lease agreement—precluding Elevate from offsetting its rent obligations from amounts it felt were due—had nullified Elevate's common law right to terminate the contract even in the event of a material breach. Elevate now challenges that ruling on appeal.

We reverse. The No Rental Offset provision does not purport to (or implicitly) extinguish Elevate's common law right to terminate the lease in the event of a material breach. What remains to be resolved is whether Hto7's failure to return the $38,000 security deposit after several months of demands constituted a material breach in the context of a multi-million dollar lease agreement. We remand that

question for the trial court's resolution because it is a quintessential question of fact that is not conducive to resolution on appeal in the first instance. *See 3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences*, 922 A.2d 439, 445 (D.C. 2007) ("Whether a particular breach of a contract is 'material' is a classic issue of fact.").

Hto7 raises its own claims in this appeal related to how the trial court calculated its damages, though they are all premised on the now-questionable proposition that Elevate breached the contract without legal justification. For the sake of judicial efficiency, we address two of these arguments now in case they arise again after remand. Hto7 argues that the trial court (1) erred in finding that Hto7 failed to take reasonable steps to mitigate its damages after Elevate terminated the lease, and (2) otherwise erred in calculating damages because it misunderstood when any replacement tenant would actually start paying rent (given the time it would take a new tenant to move in and some customary period of "free rent" at the start of commercial leases). We disagree with Hto7 on the first point; the trial court's mitigation analysis was generally sound and well-supported by the evidence. We agree with Hto7 on the second point, however, because the trial court clearly misinterpreted the testimony regarding when Hto7 could have reasonably expected to receive rent payments from a new tenant had it taken all reasonable steps to mitigate its damages. If, on remand, the trial court determines that Hto7 did not materially breach the lease agreement in the first instance, we generally uphold the

trial court's mitigation ruling, but instruct it to reconsider its damages calculation in light of the considerations below.

## I. Factual and Procedural Background

*The Lease*

Elevate agreed to an eleven-year lease with Hto7 for two floors of office space at 806 7th Street, NW, in the heart of the District's Chinatown neighborhood. The lease was executed following extensive negotiations and the lease term began on May 1, 2018. The lease set a payment schedule under which the base rent owed by Elevate increased over time, starting at about $19,000 per month during the first two years of the lease, doubling to about $40,000 in year three of the lease, and ticking up to roughly $48,000 per month by the eleventh and final year of the lease. Elevate was slated to pay more than $5 million over the entire eleven-year lease term, barring early termination (which Elevate was allowed to do at its option after seven years).

A few provisions of the lease agreement are important to our consideration of this appeal. Section 5.1 required Elevate to provide Hto7 a security deposit of about $115,000, or roughly six months' worth of the initial base rent. At the end of the second lease year (on April 30, 2020), Hto7 was obligated to refund one-third of this

amount, or about $38,000, within thirty days of receiving a written request for that refund from Elevate.

Section 16.4 of the agreement was a "No Rental Offset" provision, which stated:

> Except to the extent expressly provided in this Lease, in the event that at any time during the Lease Term Tenant shall have a claim against Landlord, Tenant shall not have the right to deduct the amount allegedly owed to Tenant from any rent or other sums payable to Landlord hereunder, it being understood that Tenant's sole method for recovering upon such claim shall be to institute an independent action against Landlord. . . . The obligation to pay rent under this Lease of Tenant is an express independent covenant of Tenant.

The lease also expressly permitted Elevate to unilaterally terminate the lease in two instances: (1) if there were a "fire or other casualty" on the premises that required more than twelve months of restoration work, or (2) if Elevate reached the end of the seventh lease year and wanted to terminate the remainder of the lease, was not in default, and had not assigned the lease to a third party. Two separate provisions of the lease specified that, "[e]xcept as expressly otherwise herein provided, time is of the essence in this Lease." The lease also included a catch-all provision which stated that remedies were cumulative:

> No right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy, and each and every right

and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing by agreement, applicable law or in equity. In addition to other remedies provided in this Lease, Landlord and Tenant shall be entitled, to the extent permitted by Law, to injunctive relief, or to a decree compelling performance of any of the covenants, agreements, conditions, or provisions of this Lease, or to any other remedy allowed to Landlord or Tenant at law or in equity. Finally, the lease provided in § 20.1 that Elevate would be in default if, among other things, it failed to pay rent or make any other required payment when due. Any such monetary default expressly permitted Hto7 to terminate the lease if Elevate, after receiving notice of its default, failed to cure it within ten business days.

*Elevate's Termination of the Lease*

On April 23, 2020, amidst the early stages of the COVID-19 pandemic, Elevate sent a letter requesting that Hto7 refund one-third of its security deposit, which it was entitled to per § 5.1 of the lease. Hto7 acknowledged receipt of the request later that day, but did not provide the refund within thirty days as required by the lease agreement. More than sixty days after that initial demand, on June 23, 2020, Elevate emailed Hto7 a notice of default with a demand to cure, noting that Hto7 was "in default" because it had not provided the required refund within the thirty days mandated by the lease and demanding that Hto7 "cure its default within

thirty days." After those additional thirty days passed with no response from Hto7, Elevate mailed a July 25, 2020, notice of termination to Hto7, stating that it was terminating the lease "for cause" because Hto7 failed to provide the security deposit refund. Elevate asserted that Hto7's failure was a material breach and demanded the return of its entire security deposit.

Three days later, Hto7, via counsel, responded with a letter contesting Elevate's right to terminate the lease in response to Hto7's "minor breach," citing the No Rental Offset provision as foreclosing Elevate's right to terminate the lease. It was at this point that Hto7 first stated that it was prepared to refund the required $38,000 of Elevate's security deposit, but that it would do so only if Elevate withdrew its notice of termination. If Elevate did not do so, Hto7 posited that it would be an "unlawful[]" attempt to get out of the lease. On July 31, 2020, Elevate responded by reiterating that it was terminating the lease for cause because Hto7 still had not returned the $38,000 security deposit refund despite receiving more than thirty days' notice and despite being given more than an additional thirty days to cure the default. Elevate vacated the space that same day, as it had previewed it would do in its July 25 notice of termination.

*Hto7's Efforts to Re-Let the Premises*

Following Elevate's termination of the lease, Hto7, through its property manager, attempted to secure a new tenant. Hto7 eventually hired Newmark Group, Inc., to serve as its leasing broker in October 2020. Hto7 also hired a company to create a three-dimensional scan of the premises so that interested tenants could tour the space virtually. Newmark worked with Hto7 to create marketing materials and listed the premises on CoStar, a commercial real estate site.

On January 6, 2021, Newmark informed Hto7 of an unnamed prospective tenant with a "need to be in Chinatown" who wanted to "occupy the space by the end of the year." Newmark reported that the interested party "asked for floorplans and rentable square footages." Hto7 provided no response. One week later, Newmark followed up, stating that the "tenant who inquired about [the Elevate space] has also asked if [Hto7 was] interested in selling the building. This is the same tenant who has asked for floorplans, ceiling heights and [rentable square footages] for the space." A week later, Newmark followed up again, indicating that the same party "continue[d] to ask about" rentable square footage "and ceiling heights," believed the space was a "great option," and needed "to be in the space" within the year. In response, Hto7's representative replied that it "continue[d] to follow up on measurements," which they anticipated being available "soon." Hto7

ultimately never provided any of the requested floorplans or other information in response to those repeated inquiries.

The following month, on February 10, 2021, another broker reached out to Newmark about a floor plan and asking price for the Elevate space. Newmark informed the broker that while there was "unfortunately" no floor plan, "ownership is getting the space measured this week." This second broker followed up with Newmark again several weeks later, in early March, asking once more if floor plans were available. In response, Newmark replied "we will have them by the end of this week or early next." Again, no measurements were ever provided.

*Litigation*

Hto7 sued Elevate for breach of contract. It sought the base rent for the remainder of the eleven-year term, or about $4.5 million, plus some additional costs for re-letting the premises, interest, and attorneys' fees. Elevate countersued for breach of contract, seeking the $38,000 security deposit refund that it had never received. The trial court granted summary judgment to Elevate on that $38,000 counterclaim, and Elevate then filed an amended counterclaim seeking the return of its entire $115,000 security deposit.

The trial court held a bench trial on the outstanding claims during which it heard testimony from various Elevate, Newmark, and Hto7 executives regarding the lease negotiations and efforts to re-let the office space. Each party presented their own expert relevant to Hto7's efforts to mitigate its damages after Elevate's termination—Michael Goldman for Hto7, and Louis Kluger for Elevate—whose testimony we detail in our mitigation discussion below.

After hearing the evidence, the trial court concluded that Elevate breached the lease agreement when it stopped paying rent and vacated the premises at the end of July 2020. The court did not opine on whether Hto7's failure to refund the $38,000 was a material breach of the lease agreement, reasoning that the question was immaterial because Elevate had bargained away its right to terminate the lease even in the event of a material breach by Hto7. In support of that view, the trial court stressed that the lease agreement's No Rental Offset provision meant that Elevate's sole recourse in the event of any breach by Hto7 was "an action for damages, rather than early termination of the Lease." The court drew further support for that conclusion from the two provisions that expressly permitted Elevate to terminate the lease early if (1) there was a "fire or other casualty" that could not be remediated within twelve months, or (2) if Elevate chose to terminate the lease after seven years. In the trial court's view, the lease agreement unambiguously provided that those two

provisions—when combined with the No Rental Offset provision—provided the exclusive bases upon which Elevate could terminate the lease.

The trial court then turned to damages. At the time of trial, Hto7 still had not secured a replacement tenant, and the trial court explained that Hto7 was entitled to recover the amounts it would have received under the lease provided that it had used commercially reasonable efforts to secure a replacement tenant. The trial court found that Hto7 made reasonable efforts to re-let the premises and mitigate damages up until March 3, 2021, which was the date of the last of Hto7's repeated unfulfilled assurances—dating back to January 2021—that it would have the measurements sought by prospective tenants "soon" or "this week." The trial court reasoned that "Hto7's failure to measure the space and provide" the requested details by that date "frustrated re-letting efforts and was, therefore, unreasonable and in violation of Hto7's duty to mitigate damages." The trial court therefore calculated damages as if Hto7 had identified a replacement tenant on March 3, 2021, and it reasoned that this new tenant would have begun paying rent in November 2021 (a finding we address in Part III.B). While the damages calculation was further complicated by a host of factors irrelevant to this appeal, at bottom the court awarded Hto7 just north of $226,000 in damages.

Hto7 filed a motion to amend the judgment arguing that the trial court erred in finding that Hto7 did not make reasonable efforts to mitigate its damages. It argued that it was entitled to unmitigated damages through the end of the lease, or about $4.5 million in unpaid base rent for the nearly nine years left on the lease term. Alternatively, it argued that the trial court erred in calculating damages as if Hto7 found a replacement tenant in March 2021 because there was insufficient evidence to conclude that Hto7 could have found a replacement tenant so quickly. Hto7 also asserted that even if it had found a replacement tenant in March 2021, the trial court erred in concluding that a tenant would begin paying rent just eight months later, given the time it would take for a new tenant to move in and then a customary "free rent" period that, by itself, would have been no less than eight months even according to Elevate's expert. The trial court denied Hto7's motion on all counts, though it did not explain why it failed to account for the time it would take for a new tenant to move into the space when calculating when a replacement tenant could be expected to start making rental payments. Both parties also filed post-judgment motions for attorneys' fees and costs, and the trial court awarded Hto7 roughly $300,000 in attorneys' fees and costs.

Elevate and Hto7 now each appeal. We begin with Elevate's challenge to the trial court's threshold finding that it breached the lease agreement before turning to Hto7's challenge of the trial court's damages calculation.

## II.  Whether Elevate Breached the Lease Agreement

Elevate argues in its cross-appeal that the trial court erred in concluding that it breached the lease agreement when it vacated the premises and stopped paying rent after July 2020.  Elevate insists that it had the common law right to terminate the lease agreement because Hto7 had already materially breached the agreement when it failed to return the $38,000 portion of its security deposit that was due to be refunded after year two of the lease.  It further argues that the trial court was wrong to conclude that the No Rental Offset provision foreclosed its common law right to terminate the agreement after Hto7's material breach, contrary to the trial court's reasoning.  We agree with Elevate that the lease agreement did not foreclose its right to terminate the lease in the event of a material breach by Hto7, though we remand for the trial court to consider whether Hto7's failure to return the $38,000 security deposit was a material breach.

### A.  Elevate Did Not Waive Its Common Law Right to Terminate in the Event of Hto7's Material Breach

It is a central principle of contract law that one party's material breach of an agreement allows the other party to stop performing under the agreement, or to put another it way, to terminate the agreement entirely.  *See 3511 13th St. Tenants' Ass'n*, 922 A.2d at 445 (one party's material breach of contract relieves the other "of

any duty to perform"); *Rosenthal v. Sonnenschein Nath & Rosenthal, LLP*, 985 A.2d 443, 452 (D.C. 2009) ("A party is excused from performance under a contract if the other party is in material breach thereof." (quoting *BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003))); *Ashcraft & Gerel v. Coady*, 244 F.3d 948, 950 (D.C. Cir. 2001) ("[A] party's continuing obligations under a contract are conditioned on there being no 'uncured material failure by the other party to render any such performance due at an earlier time.'" (quoting Restatement (Second) of Contracts § 237)). Elevate argues that Hto7's failure to return its $38,000 security deposit was a material breach that justified its termination of the lease agreement in July 2020.

Hto7 casts no doubt on this common law principle that its own material breach would ordinarily allow Elevate to terminate the lease. It instead argues that "Elevate bargained away its ability to unilaterally terminate the Lease," including for a material breach, as part of the lease agreement. It echoes the trial court's reasoning that the lease agreement's No Rental Offset provision, plus two other provisions that expressly gave Elevate the right to terminate in certain circumstances, displaced Elevate's common law right to terminate in the event of material breach.

This raises a question of how to interpret the lease agreement. "The proper interpretation of a contract," at least when it is free from ambiguity as both the parties

and the trial court agree the lease agreement is, "is a legal question, which this court reviews *de novo.*" *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006); *Unfoldment, Inc. v. D.C. Contract Appeals Bd.*, 909 A.2d 204, 209 (D.C. 2006) ("Where the language in question is unambiguous, its interpretation is a question of law for the court."). We interpret a lease agreement as a whole, giving a "reasonable, lawful, and effective meaning to all its terms." *1010 Potomac Assocs. v. Grocery Mfrs. Of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984).

Contrary to the trial court's reasoning, the No Rental Offset provision neither expressly nor implicitly waived Elevate's common law right to cease performing under the lease agreement in the event of Hto7's material breach. The No Rental Offset provision, by its plain terms, serves an entirely different purpose. It precluded Elevate from engaging in just one particular type of self-help—withholding rent to offset any damages. Terminating an agreement because of a material breach is an entirely different form of self-help that the No Rental Offset provision did not expressly or implicitly alter. While a tenant offsetting their rent obligations (which the lease agreement precludes) is an effort to continue performing under the lease, terminating a lease due to material breach puts an end to the agreement altogether. A lease agreement foreclosing the first type of self-help does not supplant the right to stop performing under the agreement entirely when the common law would justify such nonperformance.

To draw an analogy, imagine you bought a car for $20,000 and agreed to pay it off by making $1,000 payments per month for twenty months. Now let's assume your financing agreement with the dealership further said that you could not offset your payment obligations by any amounts spent to make repairs to the car that you were assured was in good working order; like the No Rental Offset provision here, your agreement says that the "sole method for recovering upon such claim shall be to institute an independent action against" the car dealership. So if you drive the car off the lot and it immediately breaks down, and needs a new $10,000 engine, you cannot simply withhold your first ten months of payments to offset the cost of that new engine. If you want to keep the car and recover damages, you would need to sue the car dealership to recover that amount. But if you had a right under the relevant lemon laws to return the car entirely, nothing in the "no offset" provision above would preclude you from availing yourself of that remedy. You are not seeking to offset any amounts due to you, or seeking to recover upon any claim against the dealership—you simply want out of the deal. And the no offset provision does not, either on its face or implicitly, foreclose any rights the law may provide you to that end.

Returning to this case, the No Rental Offset provision meant that Elevate could not withhold its June or July rental payments in order to offset the $38,000 that Hto7 was obligated to refund; to recover that amount and continue under the

lease, Elevate would have to file suit against Hto7. If Elevate had simply withheld rent, it would have been in breach of the agreement, and Hto7 would have been in a position to terminate the agreement and sue for damages per § 20.1 of the lease. But, of course, Elevate never attempted to recoup its security deposit by withholding rent payments, which is all that the No Rental Offset provision precluded it from doing. Elevate instead continued making the obligatory rent payments throughout its tenancy and up until the point that Hto7 refused to even respond to its requests to cure what Elevate alleged was a material breach of the lease agreement. If Elevate was correct that Hto7 indeed materially breached the lease agreement by failing to refund the $38,000 portion of its security deposit, nothing in the No Rental Offset provision purported to abrogate Elevate's common law right to walk away from the lease entirely, and then seek the return of its security deposit in a suit for damages, as it did.

Hto7, like the trial court, also relies on two other provisions in the lease agreement that expressly permitted Elevate's early termination of the lease as supporting its view. But those provisions do not purport to, or even seem to, displace the common law right to terminate in the event of a material breach. "For a contract remedy to be exclusive of other remedies, it must be apparent from the face of the contract that the parties intended to make it so." *Pernice v. Bovim*, 183 F.Supp.3d 84, 90 (D.D.C. 2016) (citing *Phenix-Georgetown, Inc. v. Charles H. Tompkins Co.*,

477 A.2d 215, 225-26 & n.34 (D.C. 1984), and other cases). "If a contractual provision providing for termination for breach is not exclusive, it does not bar the remedy of termination for a breach that is material or that goes to the essence of the contract." *Tricat Indus., Inc. v. Harper*, 748 A.2d 48, 60 (Md. Ct. Spec. App. 2000).

The first such provision is just an early opt-out provision, permitting Elevate to walk away from the lease after seven years. That has no conceivable bearing on Elevate's common law right to terminate. And the second provision simply codifies what amounts to a material breach in one particular context—in the event of a fire or other casualty—providing that Hto7 would have twelve months to remediate the premises before it could be deemed in material breach. But illustrating what constitutes a material breach in one context does not suggest that no other material breaches are possible, or that no other material breaches would justify termination. What's more, these provisions are caveated by § 20.5 of the lease agreement, which specifically notes that the lease agreement preserves remedies available in "applicable law or in equity," such as the right to terminate in the event of a material breach.

It would also be bizarre to read the "fire or other casualty" provision as being the sole basis upon which Elevate could terminate the contract (outside of its seventh-year option). Just imagine if Hto7, contrary to its obligations under the

contract, had simply never furnished the keys to the premises to Elevate, and had instead leased the premises out to an alternate tenant and then proactively blocked Elevate from accessing the property. That would undoubtedly have been a material breach of Hto7's core obligations under the lease agreement, and it would be an untenable reading of the contract to say that the No Rental Offset and "fire or other casualty" provisions mean that Elevate simply had to continue paying rent over the course of the eleven-year lease term while seeking damages on the back end. But that is the natural extension of the trial court's reading of the lease agreement. While parties are free to contract for harsh and even bizarre results like that, we should not lightly read such absurdities into a contract when it is just as easy to read it more sensibly. *See United States v. Winstar Corp.*, 518 U.S. 839, 907 (1996) (plurality op.) (avoiding interpretation of contract that "would be absurd"); *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (avoiding interpretation of contract that would "produce an absurd result"). If Elevate had ceded the entirety of its common law right to terminate in the event of Hto7's material breach, we would expect a much clearer statement to that effect in the contract than the No Rental Offset provision, but there is none.

Finally, Hto7 stresses that the parties to this lease were both sophisticated and "represented by competent counsel" during lease negotiations. It suggests that is a point in favor of its interpretation of the lease agreement because the parties "did not

negotiate a provision that would provide Elevate a unilateral termination right" in the event the security deposit refund was not timely. But the point cuts the other way: Elevate had that unilateral right to terminate in the event of Hto7's material breach as a matter of common law, yet the parties (sophisticated as they were) never expressly abrogated it, as they might have done. In other words, (1) the common law rule is that one party to a contract has a right to terminate in in the event of the other's material breach, so that (2) if these parties meant to extinguish that right— via the No Rental offset provision or otherwise—that intent had to be "apparent from the face of the contract," and it simply is not. *Pernice*, 183 F.Supp.3d at 90 (citing *Phenix-Georgetown*, 477 A.2d at 225-26 & n.34). Hto7's argument is thus circular: it treats the parties' sophistication as a point in its favor only because it misunderstands how sophisticated parties should have understood this lease agreement on its face, given the legal backdrop they were negotiating against. Once that legal backdrop is clarified, the sophistication of the parties becomes a point in Elevate's favor.

Contrary to the trial court's reasoning, we conclude that the agreement did not eliminate Elevate's common law right to terminate the contract in the event of Hto7's material breach.

**B. Whether Hto7 Materially Breached the Contract Is a Question of Fact That We Remand for the Trial Court's Consideration.**

That leaves the question of whether Hto7's failure to return the $38,000 due as a security deposit refund constituted a material breach of the agreement. Both parties urge us to rule on that matter in the first instance. In a nutshell, Elevate argues that it was a material breach because the agreement included "time is of the essence" clauses which it interprets to mean that Hto7's failure to promptly refund the security deposit constituted a material breach. Hto7 counters that in the context of a lease agreement contemplating more than $5 million in base rent over eleven years, the failure to refund a mere $38,000 was not a material breach.

We remand this question for the trial court to rule upon in the first instance. "Whether a particular breach of a contract is 'material' is a classic issue of fact" and is generally not conducive for us to determine in the first instance. *3511 13th St. Tenants' Ass'n*, 922 A.2d at 445. Whether Hto7's failure to return the $38,000 security deposit was a material breach "involv[es] an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties." *Id.* (quoting *Sahadi v. Continental Illinois Nat'l Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir. 1983)). One potentially relevant fact that would seem to favor a finding of materiality is that, were the roles reversed and Elevate failed to make even one month's rental payment, the contract would have allowed Hto7 to terminate the lease

if that default were not cured within ten days of Elevate receiving notice of its default. Here, Hto7 failed for more than thirty days to so much as respond to Elevate's June 23, 2021, notice of default, seeking the $38,000 refund it was due (the rough equivalent of one month's rent in that third year of the lease).

This court faced a somewhat analogous scenario in *3511 13th St. Tenants' Ass'n*, where a would-be purchaser failed to make a $25,000 earnest money deposit as a precursor to the $1.3 million purchase of a multi-unit apartment building. *Id.* at 441. Whether that failure to pay the $25,000 in earnest money was a material breach, we reasoned, could not "fairly be resolved" as a matter of law, but instead was a question for the "trier of fact," so we remanded the case for a factfinder's determination. *Id.* at 444-46. We adopt the same approach here. There is no question that Hto7 breached the lease agreement when it failed, after repeated demands, to refund Elevate the $38,000 it was due at the end of the second year of the lease. Whether that breach was a material one is a question for the trial court, as factfinder, in the first instance.

### III. Hto7's Challenges to the Damages Calculation

Hto7 raises a series of challenges to how the trial court calculated damages. Each of those challenges is premised on the proposition that Hto7 is due any damages at all, which is now unsettled. If Hto7 materially breached the lease

agreement before Elevate terminated the lease, then Elevate was within its rights to stop performing under the lease and Hto7 has not been damaged. We nonetheless exercise our discretion to address two of Hto7's arguments that "might well arise on remand" in the event the trial court concludes that Hto7's breach was not material, for the sake of judicial efficiency. *See In re G.D.L.*, 223 A.3d 100, 107 (D.C. 2020) (where an "issue could possibly become academic on remand," this court retains discretion to address it when "it might well arise on remand").

Hto7 challenges the trial court's calculation of damages in two respects that could reasonably arise on remand. First, it argues that no reasonable factfinder could have concluded that Hto7's efforts to mitigate damages ceased being reasonable as of March 3, 2021, contrary to the trial court's conclusion. Second, it argues that the trial court erred in concluding that a replacement tenant could be expected to begin rent payments in November 2021 had Hto7 acted to reasonably mitigate its damages. We disagree with Hto7 on the first point, but agree with it on the second.[1]

---

[1] Hto7 raises a third issue regarding how the trial court calculated attorneys' fees—which were recoverable under the terms of the lease agreement—but we opt not to address that issue now. The proper calculation of attorneys' fees is best left until after the trial court has addressed the materiality of Hto7's breach.

## A. Hto7's Failure to Mitigate

Hto7 first argues that the trial court erred in concluding that its efforts to mitigate damages ceased being reasonable as of March 3, 2021. The duty to mitigate damages "bars recovery for losses suffered by a non-breaching party that could have been avoided by reasonable effort and without risk of substantial loss or injury." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 586 (D.C. 2015) (internal quotation marks omitted). A lease provision giving the lessor a right to recover lost rent is subject to a requirement that the lessor use "reasonable efforts" to re-let the space. *Lennon v. U.S. Theatre Corp.*, 920 F.2d 996, 1000 (D.C. Cir. 1990). "[T]he failure to mitigate damages is an affirmative defense," and the burden of demonstrating an absence of reasonable efforts to mitigate lies with the tenant. *Sizer v. Lopez Velasquez*, 270 A.3d 299, 303 (D.C. 2022) (citing *Norris v. Green*, 656 A.2d 282, 287 (D.C. 1995). "Generally, [w]hat is a reasonable effort to [mitigate damages] is a question of fact, and thus for [the factfinder] to decide." *Havilah Real Prop. Servs. v. VLK*, 108 A.3d 334, 343 n.8 (D.C. 2015) (internal citation omitted). We review questions of fact under a clearly erroneous standard, and will not set aside the trial court's factual findings unless they are clearly wrong and without evidence to support them. *Mingle v. Oak St. Apartments Ltd.*, 249 A.3d 413, 415 (D.C. 2021).

From January through early March of 2021, Hto7 repeatedly fouled off requests from prospective tenants who asked for floor plans and measurements of the premises. Emails entered into evidence showed that Hto7 was on notice that at least one prospective tenant—a seemingly eager one—sought floor plans, ceiling heights, and rentable square footages for the property as early as January 2021, but that Hto7 made no reasonable efforts to accommodate its requests. By its own representative's estimate, Hto7 expected as of mid-January 2021 that it would have the relevant measurements "soon." Then in early February it offered its assurances that it was "getting the space measured this week," then again in early March it said it would have them "this week or early next." Yet the requested measurements never materialized at any point, and Hto7 never offered any contemporaneous explanation for its delays. That record alone, before we even consider the testimony of the competing experts, provides adequate support for the trial court's finding that Hto7 did not act with reasonable diligence to mitigate its damages. "A factfinder can put two and two together without the help of an expert mathematician explaining how to do so." *See KS Condo v. Fairfax Village Condo. VII*, 302 A.3d 503, 511 (D.C. 2023).

Beyond the emails and Hto7's lack of any contemporaneous explanation for its months-long delays in responding to the requests of potential tenants, Elevate submitted an expert report from Louis Kluger that noted how as of the June 2021

date of his report, Hto7 (1) had still "not furnished floorplans or an accurate square footage" to tenants that expressed interest in the space, and (2) had not shown the space to any tenant. Kluger also testified at trial that Hto7's failure to provide the relevant "marketing materials for a ten-month period is well beyond the norm."

Hto7 counters that its own expert, Michael Goldman, offered contrary testimony that the trial court ignored. Goldman opined that it was not unreasonable for Hto7 not to have procured floor plans by March 3, 2021, because they were difficult to quickly procure during that stage of the COVID-19 pandemic, and in any event, the floor plans should not have mattered to interested tenants because a virtual tour of the premises was available to them and better than mere floor plans. In support of its position, Hto7 points to *Norris v. Green*. In *Norris*, after tenants vacated a property, the landlord attempted to mitigate damages only by placing "For Sale" and "For Rent" signs in the window. 656 A.2d at 284. This court found that, despite those apparently meager efforts to mitigate, the tenants simply failed to offer any evidence that the landlord's efforts to re-let the space were unreasonable. *Id.* at 287-88. Hto7 argues that this case presents an "indistinguishable" scenario given that Goldman testified that Hto7's efforts were "comprehensive" and "explained in detail why having two-dimensional floor plans available on March 3, 2021 was not only unnecessary but also complicated." Hto7 also asserts that "Elevate presented no evidence to the contrary."

But Hto7 is just wrong to assert that Elevate did not provide any evidence to the contrary. As already discussed, the January 2021 emails showed that an interested party considered the space a "great option," needed to be in the neighborhood by early the following year, and liked the property enough to follow up twice in pursuit of measurements. And while Hto7's own representatives contemporaneously and repeatedly indicated they could provide the requested measurements "soon" and "this week," they failed to ever do so, without explanation. Those false assurances without any explanatory follow-up were facially unreasonable, no matter how difficult it was to procure floorplans or measurements at that time. And unlike in *Norris*, Elevate's expert supported the already fairly obvious conclusion that a party seeking to mitigate millions of dollars in damages cannot give the silent treatment to prospective tenants who are seeking fairly routine measurements and floorplans. The trial court's finding, that "Hto7's failure to measure the space and provide details of the Premises . . . before March 3, 2021, frustrated re-letting efforts and was, therefore, unreasonable and in violation of Hto7's duty to mitigate damages," had strong support in the evidence.

## B. The Court Misunderstood the "Free Rent" Testimony

Finally, Hto7 argues that the trial court misinterpreted the expert testimony about when Hto7 could have expected to receive rent payments from a replacement tenant. We agree.

After concluding that Hto7 failed to take reasonable mitigation efforts as of March 3, 2021, the trial court was left to address a counterfactual scenario in order to calculate Hto7's damages: Had Hto7 acted reasonably at that time, when could a replacement tenant expect to begin making rent payments? In answering that question, the trial court should have accounted for two distinct periods after March 2021 but before Hto7 could expect to receive any rent payments.

The first period where Hto7 would expect to receive no rental proceeds is what we will call the "move in" period. Hto7's expert (Goldman) explained that was the "period of time in between when the tenant signs the Lease and then actually moves into the space," during which the parties finalize the lease and build out the space to tailor it to the tenant's needs. Goldman opined that this move-in period could be expected to last six to twelve months before a replacement tenant actually moved

into the space, and Elevate's expert (Kluger) did not appear to offer any clear opinion on the matter.

The second period where Hto7 would expect to receive no rental proceeds is what we call the "free rent" period, which both Goldman and Kluger agreed is a customary part of commercial leases where tenants do not pay rent for some initial period after they move in. Kluger estimated that a tenant could negotiate one month of free rent per lease year, which here translated to an eight-month free rent period based on the eight years remaining on Elevate's lease. Goldman, by contrast, opined that a replacement tenant could have negotiated one-and-a-half to two months of free rent per lease year, so that a new tenant would have expected twelve to sixteen months of free rent.

The trial court ultimately credited Kluger's estimate that a new tenant could expect just eight months of free rent, which the trial court originally (but incorrectly) posited was "within Goldman's estimate of six to twelve months" of free rent. But the trial court did not account for any move-in period, as if a tenant could have been expected to move into the space immediately once it had been identified in March 2021. So the court projected that Hto7 would begin receiving rent from a replacement tenant in November 2021, eight months after Hto7 might have identified a replacement tenant had it reasonably mitigated its damages.

In its motion to amend the judgment Hto7 correctly alerted the trial court to two distinct errors. First, it pointed out that Goldman had estimated a twelve-to-sixteen month free rent period, not six to twelve months as the trial court posited, so that Kluger's eight-month estimate was not, in fact, "within Goldman's estimate." Second, that free rent period was *in addition to* the six-to-twelve month move-in period that it would actually take for any lease term to commence—a period the trial court did not account for. The trial court denied the motion to amend, reasoning that it had "evaluated and weighed competing expert opinion" and found Kluger's estimate that Hto7 would receive rent eight months after identifying a replacement tenant "persuasive."

The problem with that reconciliation of the testimony is that Kluger never opined that a new tenant could move into the space the moment they had been identified, which under the trial court's mitigation analysis would have been no sooner than March 3, 2021. So while we take no issue with the trial court's decision to credit Kluger's projected eight-month free rent period over Goldman's twelve-to-sixteen month free rent projection, the trial court failed to account for any move-in period, i.e., the amount of time it would take a new tenant, once identified, to actually move into it.

A calculation of damages must rest on "an adequate basis for a reasoned judgment." *Vector Realty Grp., Inc. v. 711 Fourteenth St., Inc.*, 659 A.2d 230, 234 (D.C. 1994) (internal quotation marks omitted). We are mindful that "damages need not be calculated with 'mathematical precision,'" particularly in the context of assessing counterfactuals like the one the trial court confronted. *Havilah*, 108 A.3d at 352 (quoting *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 903 (D.C. 2008)). But the trial court's failure to account for any move-in period preceding the commencement of a lease term and any free rent period was unexplained and seemingly unsupported even by Kluger's testimony. It also overlooks a potentially substantial sum, as six to twelve months of rent payments under an expected lease would amount to hundreds of thousands of dollars. Should the trial court conclude that Hto7 did not materially breach the lease agreement in the first instance, it should reassess its calculation of damages and offer some accounting for the period of time it would take for a replacement tenant to move into the space after March 2021.

## IV. Conclusion

For the foregoing reasons, we reverse the trial court's determination that Elevate did not have a right to terminate the lease in the event of Hto7's material breach. We remand for the trial court to consider whether Hto7 materially breached

the agreement and hold that any such breach would have justified Elevate's early termination of the lease.  And should the issues arise again on remand, we uphold the core of the trial court's mitigation analysis, but conclude that it erroneously failed to account for any move-in period that would precede the receipt of rental payments from any replacement tenant.  It should account for that phase of no rental payments if it has to recalculate Hto7's damages.

*So ordered.*